SHANDOULIA WALLACE, Indiv. and as Adm'r of the Estate of Waketta Roy Wallace, Deceased, Plaintiff-Appellant, v. JOHN P. SMYTH *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 1—97—0467

Opinion filed October 21, 1998.—Rehearing denied December 4, 1998.

BURKE, J., dissenting.

Stanley L. Hill & Associates, of Chicago, for appellant.

Robert C. Yelton III and Jeffrey Edward Kehl, both of Dowd & Dowd, Ltd., of Chicago, for appellees.

PRESIDING JUSTICE LEAVITT delivered the opinion of the court:

On July 16, 1996, Shandoulia Wallace filed her second amended complaint alleging the defendants acted negligently, willfully, and wantonly with regard to Waketta Wallace (Waketta). The judge subsequently granted the defendants' motion to dismiss the negligence claims. She held Illinois' parental immunity doctrine shielded the defendants from liability for negligence because they stood *in loco parentis* to Waketta. We reverse and remand.

Twelve-year-old Waketta, a ward of Illinois, was, on July 11, 1989, temporarily residing at Maryville Academy (Maryville) for a 90-day diagnostic assessment that would yield recommendations for his future placement. Maryville was an independent contractor providing services to the Illinois Department of Children and Family Services (DCFS) for money. DCFS at all times remained the legal guardian of the children it placed at Maryville, including Waketta, and Maryville was required to consult DCFS staff members regarding important decisions affecting the children DCFS placed there. For instance, on June 13, 1989, Maryville obtained permission from Waketta's guardian at DCFS to administer psychotropic medications to Waketta. Also, on July 5, 1989, assistant Maryville program director Laura Angelucci obtained permission from Waketta's guardian at DCFS to take Wa-

ketta on a field trip to Wisconsin.

While at Maryville, Waketta stayed in the home of Paul Voltz, who was the Maryville program manager. Waketta typically left the Voltz home to attend school for eight hours per day, then returned to the Voltz home. On July 11, 1989, at approximately 12:50 p.m., Waketta returned from school early. He reported to Voltz's office and showed Voltz and Angelucci a note from his teacher stating Waketta had a "good day" at school.

At around 1:45 p.m., Jill Jacobe, a family educator at Maryville, came to Voltz's office and told him Waketta was in study hall, where he was supposed to be reading, but he had instead closed his eyes and pretended to sleep. Angelucci called nurse Dee Le Bel and inquired whether Waketta's sleep could have resulted from his medication. Le Bel said she believed Waketta was feigning sleep, although she never personally saw Waketta. Voltz told Jacobe to send Waketta to his office.

Waketta reported to Voltz's office, where Voltz confronted Waketta about his behavior. Waketta threatened to leave the home, then Voltz followed Waketta out of his office to the back door of the Voltz home. Voltz told Waketta because of his bad behavior he could not leave the home. The two returned to Voltz's office.

In Voltz's office, Waketta took a pick out of his pocket and began to pick his hair. Voltz asked him to put the pick away. After asking Waketta to put the pick down, Voltz said Waketta made threatening gestures toward him but never touched Voltz or even stood up. Voltz walked over to Waketta and held Waketta's hands at the wrists crossed on Waketta's lap. According to Angelucci, who witnessed these events, Voltz had an awkward position with regard to Waketta and asked Waketta to stand up, which he did, and the two walked to the hallway.

Once they reached the hallway, Voltz called for assistance. Angelucci responded. When Angelucci reached the hallway, Waketta was on the floor, on his back with his arms crossed in front of him. Voltz held Waketta's wrists. Angelucci testified she "laid across [Waketta's legs] and he began to struggle." Angelucci called for Jacobe to help her. Jacobe held Waketta's ankles while Angelucci remained on his legs. Waketta struggled, and the three counselors switched positions.

At some point before 3 p.m., the counselors flipped Waketta onto his stomach. Jim Geidner, another family counselor, said when he arrived sometime before 3 p.m., Waketta was on his stomach in a baskethold with his arms crossed at the abdomen and his wrists held firmly to the floor. Voltz was straddling Waketta's lower back and Angelucci was lying on Waketta's legs. Geidner replaced Angelucci on Waketta's legs. At 3 p.m., Xavier Collier came on duty and aided in the restraint.

This continued for approximately four hours in the middle of the hallway floor while other children walked past. Waketta struggled mainly when other children were present. In the course of his restraint, Waketta warned the counselors he had to urinate and that he might urinate upon himself. They continued to restrain him. Even after Waketta urinated upon himself, the counselors continued to restrain him.

According to Angelucci, after Waketta was flipped to his stomach, "he began to calm down again and was lying quietly." At approximately 6 p.m., Voltz instructed Angelucci to "get off [Waketta's] legs." Angelucci said she did so and immediately noticed Voltz checking Waketta's pulse and breathing. The counselors flipped Waketta onto his back and Voltz unsuccessfully attempted to resuscitate Waketta. Angelucci called an ambulance. Waketta was dead.

Dr. Robert J. Stein, chief forensic pathologist at the Cook County medical examiner's office, performed Waketta's autopsy. He testified the cause of Waketta's death was asphyxia, a lack of oxygen. According to Dr. Stein, that finding is consistent with the scenario of Waketta lying facedown with his arms crossed in front of his neck and a 120-pound man on his back. Also, the autopsy revealed an abrasion on Waketta's elbow consistent with the scenario of Waketta lying facedown struggling with his arms crossed at his chest.

Dr. Stein said that, with Waketta's arms crossed in front of his chest and one person holding each arm, there was compression of Waketta's carotid, his vagus nerve, and internal jugular. Dr. Stein also found evidence of petechial hemorrhages, a larger hemorrhage, pulmonary edema, and pulmonary congestion. He explained petechial hemorrhages are small hemorrhages of capillaries almost always caused by strangulation. However, he noted no evidence of intentional strangulation existed here.

Waketta's death certificate indicated the cause of his death was positional asphyxiation and stress due to restraint. Dr. Kirschner, another doctor at the Cook County medical examiner's office, testified positional asphyxiation "is a condition where an individual requires a large intake of air usually because they are excited or in an emotional state, and they are breathing rapidly, and they are in a position that does not allow them to breathe rapidly or deeply enough to get sufficient air into their lungs to maintain respirations."

Denise Kane, Inspector General for DCFS, testified she preliminarily investigated Waketta's death. She learned Waketta was diagnosed as hyperactive, emotionally disturbed, and possibly suffering from attention deficit disorder while at the Old Orchard Hospital just prior to his arrival at Maryville. These psychological problems left Waketta un-

able to stay on task for very long and made him easily distractible. Ms. Kane also testified Waketta was going through a tremendous growth spurt at the time of his death, causing him to tire easily. This resulted from his internal organs, including his heart, growing rapidly, which caused him to expend massive amounts of energy. Ms. Kane said this certainly should have been considered by nurse Le Bel and the other counselors who assessed Waketta's condition on July 11, 1989.

Finally, Ms. Kane said, in her expert opinion, the situation was not an emergency and the restraint used on Waketta was not effective, was not proportionate to his behavior, was not temporary, and was inappropriate because it occurred in a public hallway with other children watching. She further said alternatives to physical restraint were never explored by the counselors.

After hearing this testimony, the jury found for the defendants on the willful and wanton counts. The only issue Ms. Wallace raises for our review is whether the judge erred as a matter of law in granting the defendants' motion to dismiss her negligence counts pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1996)).

■ A cause of action should not be dismissed on the pleadings unless it clearly appears no set of facts can be proved that would entitle the plaintiff to relief. *Fitzgerald v. Chicago Title & Trust Co.*, 72 Ill. 2d 179, 187, 380 N.E.2d 790 (1978). We review orders granting motions to dismiss *de novo*. *Lawson v. City of Chicago*, 278 Ill. App. 3d 628, 634, 662 N.E.2d 1377 (1996). Because we find Ms. Wallace's complaint alleged facts that tended to establish Maryville was not *in loco parentis* regarding Waketta, we reverse the judge's order dismissing Ms. Wallace's negligence counts, and remand.

■ The term *in loco parentis* implies "a standing in the place of a parent; one charged fictitiously with parents' rights, duties, and responsibilities." *Bland v. Department of Children & Family Services*, 141 Ill. App. 3d 818, 822, 490 N.E.2d 1327 (1986). At common law, *in loco parentis* status belonged to persons who put themselves in a parent's shoes by assuming all parental obligations toward a child without going through the formalities of legal adoption. See *Hawkey v. United States*, 108 F. Supp. 941, 943 (E.D. Ill. 1952). We have held that parties must assume the usual financial burdens of parenthood before they can be considered *in loco parentis*, and such status is granted sparingly. *Busillo v. Hetzel*, 58 Ill. App. 3d 682, 684, 374 N.E.2d 1090 (1978); see also *Lawber v. Doil*, 191 Ill. App. 3d 323, 326, 547 N.E.2d 752 (1989) (holding *in loco parentis* status was proper where child's stepfather was unemployed and thus did not financially support the child, but acted as a parent in all other respects, because he assumed

the financial burden of parenthood but was simply, temporarily, unable to satisfy it).

In this case, Ms. Wallace alleged in her second amended complaint:

> "4. That at all times relevant herein, MARYVILLE ACADEMY was a not-for-profit corporation organized under the laws of the State of Illinois and was licensed by the State of Illinois to house, care for and educate children, *including those committed to the custody of the State of Illinois, or its agency Illinois DCFS.* MARYVILLE ACADEMY acts as a contractual agent of the State of Illinois in caring for these children.
>
> 5. That at all times relevant herein, the plaintiff's decedent, WAKETTA, was *a ward of the State of Illinois who was committed to the custody of DCFS."* (Emphasis added.)

For purposes of a section 2—615 motion, the judge was required to accept the preceding allegations and all reasonable inferences flowing therefrom as true. *Szajna v. General Motors Corp.*, 130 Ill. App. 3d 173, 176, 474 N.E.2d 397 (1985).

■ The defendants claim Ms. Wallace conceded Maryville stood *in loco parentis* regarding Waketta when she pled Maryville "was licensed by the State of Illinois to house, care for and educate children [including Waketta]." We disagree. While Ms. Wallace alleged Maryville "was licensed" to do those acts, housing, caring for and educating a child do not alone confer *in loco parentis* status. Examples of situations where housing, care and education are provided children by persons we have not generally held *in loco parentis* to those children include: summer camps, day-care centers, medical and psychological treatment facilities, and grandparents, for example. See *Cates v. Cates*, 156 Ill. 2d 76, 99, 619 N.E.2d 715 (1993) (holding parental immunity from negligence liability will not be invoked unless a case involves "conduct intimately associated with the parent-child relationship," because "the immunity exists only to further the parent-child relationship, and where that relationship is not impacted, the policies supporting the doctrine lose their persuasive strength").

In certain circumstances teachers are *in loco parentis* with regard to students, but that is by legislative enactment, not judicial fiat. 105 ILCS 5/24—24 (West 1996). Additionally, as our supreme court explained in *Cates*, a teacher, whose *in loco parentis* status is legislatively defined is immune based on his special status "only to the extent he acts within the confines of his duties *in loco parentis.*" *Cates*, 156 Ill. 2d at 100. No statutory equivalent insulating corporations, like Maryville, from liability for negligently supervising or disciplining children exists. The relevant legislation here is the Illinois

Administrative Code, which states DCFS has legal and financial responsibility for children of whom it is guardian, regardless of their momentary location. That obligation entails providing for such children's clothing, mental health care, camp fees and supplies, cultural enrichment, educational expenses, and medical care. 89 Ill. Adm. Code §§ 359.7, 359.9 (1996).

Ms. Wallace alleged Waketta was at Maryville temporarily for a diagnostic evaluation but remained a ward of Illinois. She further alleged DCFS retained control over important decisions affecting Waketta as well as financial responsibility for Waketta during his interim stay at Maryville. Nonetheless, the trial court dismissed Ms. Wallace's negligence claims, stating:

> "I am convinced from the cases that the defendants have tendered to me, and from the arguments made, and everything that I know about the case that Maryville was acting de facto as loco parentis for this child. Therefore, the motion to strike Counts I and III for ordinary negligence—that are based on ordinary negligence, that motion will be granted. I do not believe that Maryville can be sued under theories of ordinary negligence."

Because the preceding allegations made by Ms. Wallace do not in any way establish as an inevitable conclusion that Maryville stood *in loco parentis* with regard to Waketta but, rather, that in conjunction with Illinois' statutory scheme they intone that DCFS bore ultimate responsibility for traditional parental functions with regard to Waketta, we find the court improperly granted the defendants' motion to dismiss.

For all of these reasons, the order of the trial court dismissing Ms. Wallace's negligence counts is reversed, and this cause is remanded.

Reversed and remanded.

CAHILL, J., concurs.

JUSTICE BURKE, dissenting:

I respectfully disagree with the majority's holding that *in loco parentis* status should not be extended to Maryville. Plaintiff alleged that Maryville was licensed to house, care for and educate wards of the state, its relationship with Waketta also entailed providing him with proper medication, discipline and supervision, and that "MARYVILLE ACADEMY acts as a contractual agent of the State of Illinois in caring for these children." Based on these allegations, I believe that the trial court properly determined that Maryville stood *in loco parentis* to Waketta. I further would affirm the trial court's dis-

missal of plaintiff's negligence claims against Maryville based on the doctrine of sovereign immunity because Maryville is an agent of the state, performing the state's nondelegable duty to care for wards of the state and, therefore, the trial court lacked subject matter jurisdiction over this matter.

In *Cates*, our supreme court held that parental immunity should be afforded to conduct that "concerns parental discretion in discipline, supervision and care of [a] child"; "conduct inherent to the parent-child relationship." *Cates*, 156 Ill. 2d at 104-05. The *Cates* standard was subsequently applied in *Commerce Bank v. Augsburger*, 288 Ill. App. 3d 510, 680 N.E.2d 822 (1997), where the defendants were foster parents who argued that they were immune from liability for the injuries and death of their foster child pursuant to the doctrines of parent-child tort immunity and sovereign immunity.[1] In holding that the parent-child tort immunity doctrine barred the plaintiff's negligence claims against the defendant foster parents, the *Augsburger* court reasoned that "foster parents *** have responsibility in regard to the supervision and discipline of those children under their care. *** Foster parents are nearly as much in need of leeway in this regard as are natural parents." *Commerce Bank*, 288 Ill. App. 3d at 517.

Here, plaintiff's claims clearly arose out of Maryville's supervision and discipline of Waketta. Waketta was a full-time resident of Maryville and it provided his day-to-day care, nurturing, housing, medical treatment, supervision and discipline, all of which are the types of duties and responsibilities recognized by *Cates* as "inherent to the parent-child relationship." Additionally, just as the *Augsburger* court determined that a foster parent's care of a state ward is nearly the same care given by a natural parent, Maryville's care of Waketta in all practical respects had taken the place of Waketta's parents. Similarly, with respect to the majority's denial of *in loco parentis* status to Maryville based on the fact that DCFS was the legal guardian of Waketta and he was only allegedly placed with Maryville *temporarily*, it should be noted that foster parents do not have legal custody of the foster children placed with them, these children are generally placed on a *temporary* basis and foster parents nonetheless have been held to be *in loco parentis*.

---

[1]The *Augsburger* court subsequently held that the foster parents were not agents of the state and, therefore, not protected under the sovereign immunity doctrine because the relationship between the foster parents and the state was too remote, *i.e.*, the foster parents had contracted with a private corporation which had contracted with DCFS.

While the majority cites to *Cates* for the proposition that summer camps, day-care centers, medical and psychological treatment facilities, and grandparents "have not generally [been] held *in loco parentis*" to children[2] (301 Ill. App. 3d at 80), I believe, without expressing an opinion as to the legal correctness of this statement, that these situations are readily distinguishable from Maryville's care of children. In the former, children are placed temporarily, presumably by their parents, and returned to their parents. In the case of a ward of the state, each placement of the child, be it for as little as a few days, 90 days as here, or more, is a permanent placement each time the ward is placed because the ward will always be in placement somewhere, each placement is where the child's "family" is, and it is to another placement that a ward is "returned to," rather than to the parents.

I also agree with defendants that the fact that no statutory provision exists conferring *in loco parentis* status to institutions such as Maryville is not determinative of whether this status should be conferred upon Maryville. In recognizing this statutory immunity, our supreme court stated that it "did not reexamine the public policies underlying the parent-child tort immunity doctrine, nor the scope of the immunity as applied to negligence cases between parent and child," but that "the parameters of the tort immunity as applied to teachers are fully congruent with their statutorily defined status *in loco parentis*" in supervising and disciplining children. *Cates*, 156 Ill. 2d at 100. Clearly, therefore, the parent-child tort immunity doctrine factors of legal and financial responsibility, which the majority relies upon to deny Maryville *in loco parentis* status, had no bearing on the *in loco parentis* status conferred upon teachers. These factors thus are not a persuasive foundation for denying Maryville *in loco parentis* status.

I further believe that the trial court should have dismissed this case for lack of subject matter jurisdiction based on sovereign immunity. Although the trial court did not consider this doctrine and the parties have not raised it on appeal, "[l]ack of subject-matter jurisdiction is an issue that can be raised at any time." *Currie v. Lao*, 148 Ill. 2d 151, 157, 592 N.E.2d 977 (1992). Additionally, "a reviewing court may sustain the decision of the trial court on any grounds called for by the record." *Estate of Johnson v. Condell Memorial Hospital*, 119

---

[2]*Cates* in fact states only, without discussion, that an exception to the parent-child tort immunity doctrine allows children to sue their grandparents; *Cates* does not contain any discussion of summer camps, day-care centers or medical and psychological treatment facilities

Ill. 2d 496, 502, 520 N.E.2d 37 (1988). In the present case, as stated above, plaintiff alleged in her complaint that "MARYVILLE ACADEMY acts as a contractual agent of the State of Illinois in caring for these children." As an agent of the state, therefore, Maryville would be immune from liability for its negligence under the doctrine of sovereign immunity, as foster parents have similarly been held immune pursuant to the doctrine. See *Nichol v. Stass*, 297 Ill. App. 3d 557, 697 N.E.2d 758 (1998), *appeal allowed*, 179 Ill. 2d 588 (1998); see also *Augsburger*, 288 Ill. App. 3d at 512 (agents of the state are "clothed with governmental immunity," which deprives the circuit court of jurisdiction "under the terms of section 8(d) of the Court of Claims Act (705 ILCS 505/8(d) (West 1994))").

In *Nichol*, the plaintiffs filed a complaint against the defendant foster parents based on negligent supervision, monitoring and care of the foster child, who died of drowning while in the foster parents' care. The trial court dismissed the count against the foster parents based on sovereign immunity and lack of subject matter jurisdiction. On appeal, this court affirmed, stating that even if the foster parents could be considered "independent contractors of the state, strong argument can be made that they were performing the state's nondelegable duties toward its foster children/wards" and "[i]f the state's duty is nondelegable, the conduct of the foster parent in performing that duty is by definition the conduct of the state, and the foster parent is an agent of the state for that purpose." *Nichol*, 297 Ill. App. 3d at 562. Based on its finding that "the state is required by statute to provide direct child welfare services for foster children who are its wards [citation] and to establish rules and regulations concerning foster care" (*Nichol*, 297 Ill. App. 3d at 563), the *Nichol* court concluded "that the duties of the state to foster children are in fact nondelegable such that the breach of those duties would impose vicarious liability upon the state for the negligence of the foster parents" and, "[a]lthough the relationship between the state and the foster parents may not be that of employer-employee, it is analogous insofar as the state would be vicariously liable for the acts of the foster parents as if they were employees" (*Nichol*, 297 Ill. App. 3d at 564). The *Nichol* court further found that the duty of care owed by the foster parents was not "derived from a source independent of the foster parent's relationship with the state" (*Nichol*, 297 Ill. App. 3d at 568), which supported the court's finding that the plaintiff's action was in fact against the state. More specifically, the *Nichol* court stated:

> "[T]he duties alleged to have been breached were the failure to exercise ordinary care in the supervision and care of the deceased foster child and the failure to comply with various standards, rules

and regulations and guidelines established by [DCFS]. These duties do not have a source independent of the foster care relationship. Clearly, the duty to comply with [DCFS] rules and regulations would not exist outside of the relationship between the state and the foster parents. The former breach also is dependent on that relationship because without that relationship the foster parent would have no duty to exercise ordinary care in the supervision and monitoring of the foster child. That legal duty, which ultimately rests with the state, is only undertaken by the foster parent pursuant to agreement with the state." *Nichol*, 297 Ill. App. 3d at 568.

See also *Illinois Nurses Ass'n v. Illinois State Labor Relations Board*, 196 Ill. App. 3d 576, 582, 554 N.E.2d 404 (1990), *vacated on other grounds*, 499 U.S. 944, 113 L. Ed. 2d 462, 111 S. Ct. 1406 (1991), *on remand*, 244 Ill. App. 3d 1, 614 N.E.2d 13 (1991) (holding "any corporation performing duties which are statutorily (and constitutionally) mandated as government duties must, at the very least, be acting on behalf of the State and is, thus, an agent of the State");[3] *cf. Augsburger*, 288 Ill. App. 3d 510.[4]

In the present case, the state has the nondelegable duty of caring for its wards; as the majority points out, "DCFS has legal and financial responsibility for children of whom it is guardian." It is also manifest that Maryville's conduct was regulated by DCFS through many specific licenses, contracts, regulations, and inspections. 225 ILCS 10/8 (West 1996) (allowing DCFS to revoke or not renew a license for such conduct as refusing to submit to an investigation and failing to follow the regulations prescribed by DCFS); see also 89 Ill. Admin. Code

---

[3]*"Illinois Nurses Ass'n v. Illinois State Labor Relations Board*, 196 Ill. App. 3d 576, 554 N.E.2d 404 (1990), was vacated for reasons other than its agency analysis, based upon an issue of federal preemption first raised in the appeal of that case to the United States Supreme Court. *Illinois Nurses Ass'n v. Illinois State Labor Relations Board*, 244 Ill. App. 3d 1, 614 N.E.2d 13 (1991). However, notwithstanding that vacatur, the agency discussion in that case has since been cited in *Commerce Bank v. Augsburger*, 288 Ill. App. 3d 510, 680 N.E.2d 822 (1997)." *Nichol*, 297 Ill. App. 3d at 562 n.2.

[4]In *Augsburger*, the court held that the plaintiff's claims for negligence against foster parents were barred by parental immunity, but those claims were not barred by sovereign immunity. *Augsburger* is distinguishable from the present case regarding our holding on the issue of sovereign immunity because a third-party contractor was involved, making too remote the foster parents' relationship to the state (*i.e.*, the foster parents contracted with a private corporation which had contracted with DCFS), whereas here DCFS contracted directly with Maryville.

§ 384.1 *et seq.* (eff. November 15, 1982) (providing guidelines for the discipline of wards, and the use of physical restraint). Maryville provides for the day-to-day care and living necessities of children placed with it by the state; it can bind the state legally to pay out monies expended to support the children placed with it; and it has the right to discipline and the responsibility to insure the children are adequately supervised, educated and nurtured. Maryville, like foster parents, must receive consent from DCFS before traveling outside the state and for major medical decisions concerning the children placed with it. Based on the duties Maryville performs for the state's wards, Maryville is therefore an agent of the state. Additionally, the alleged negligence of Maryville arose only because of Maryville's status as a licensed facility to care for state wards. Accordingly, just as in *Nichol*, the state's sovereign immunity here operates to defeat the trial court's subject matter jursidiction.

In conclusion, the majority fails to realize that state wards like Waketta will always be at a placement. The state is unable to do what the majority says it must under the Illinois Administrative Code; it is unable to provide the care its wards require and instead must pay someone else to actually give that care to its wards. Institutions such as Maryville provide that care; care which is inherent to a parent-child relationship and requires Maryville's decision-making in disciplining and supervising the children. Notwithstanding that the legislature has not enacted law conferring *in loco parentis* status on institutions such as Maryville, the parent-child tort immunity doctrine may be judicially modified to correspond with the changes in our society with respect to institutions providing care to the state's wards. See *Cates*, 156 Ill. 2d at 108 ("the parent-child tort immunity doctrine developed in an era which was vastly different from the present," and "we must *** consider the very real needs of our children in today's world." "In this regard, *** the parent-child tort immunity doctrine was created by the courts and it is especially for them to interpret and modify the doctrine to correspond with prevailing public policy and social needs"). Additionally, because Maryville acts as an agent of the state, the doctrine of sovereign immunity precluded the trial court's exercise of jurisdiction over plaintiff's negligence claims against Maryville.

For the reasons stated, I would affirm the judgment of the circuit court dismissing plaintiff's negligence claims against defendants.