SECOND DIVISION

December 18, 2001

No. 1-97-0467

SHANDOULIA WALLACE, Indiv. and as Adm'r of the Estate of Waketta Roy Wallace, Deceased,

Plaintiff-Appellant,

v.

JOHN P. SMYTH, PAUL VOLTZ, LAURA ANGELUCCI, and XAVIER COLLIER, Indiv. and as Agents and Employees of Maryville Academy; and MARYVILLE ACADEMY, a Not-For-Profit Corporation; JILL JACOBE, JIM GEIDNER, and DEE LE BEL, R.N., Indiv. and as Employees of Maryville Academy,

Defendants-Appellees.

)

)

)

)

)

)

)

)

))

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable

Barbara J. Disko,

Judge Presiding.

JUSTICE McBRIDE delivered the opinion of the court:

This court has previously rendered an opinion in the instant case.  
Wallace v. Smyth
, 301 Ill. App. 3d 75, 703 N.E.2d 416 (1998).  The supreme court, in the exercise of its supervisory authority, has now remanded the case to us for additional consideration in light of its decision in 
Nichol v. Stass
, 192 Ill. 2d 233, 735 N.E.2d 582 (2000).  
Wallace v. Smyth
, 191 Ill. 2d 562, 735 N.E.2d 1001 (2000) (denying defendants' petition for leave to appeal and remanding case to the appellate court).

Waketta Wallace (Waketta), a minor, died while a ward of the State of Illinois.  Following his death, plaintiff Shandoulia Wallace, individually and as administrator of Waketta's estate, brought an action against defendants Maryville Academy (Maryville) and John P. Smyth, Paul Voltz, Laura Angelucci, Xavier Collier, Jill Jacobe, Jim Geidner, and Dee Le Bel, individually and as agents and/or employees of Maryville.

The facts, briefly, are as follows.  On July 11, 1989, Waketta was a 12-year-old ward of the State who was residing at Maryville during the course of a 90-day diagnostic assessment which would yield recommendations for his future placement.  According to the second amended complaint, Maryville was a not-for-profit corporation licensed by the state of Illinois to house, care for, and educate children, including children who have been made wards of the State or of the Illinois Department of Children and Family Services (DCFS).  Maryville contracted with DCFS to provide such services for money.  DCFS remained the legal guardian of Waketta and all other children it placed at Maryville.  Maryville was required to consult DCFS staff regarding certain decisions affecting the children DCFS placed there.  Examples, in Waketta's case, included obtaining permission from his DCFS guardian to administer psychotropic medications and permission to take him on a two-week-long field trip to Wisconsin.

On July 11, 1989, Waketta died after being restrained by various Maryville staff members in a prone position for over four hours.  The cause of death was listed on the death certificate as positional asphyxiation and stress due to restraint.

Plaintiff brought an action against defendants alleging that the defendants had acted willfully and wantonly in causing Waketta's death.  After the case was set for trial, plaintiff filed a second amended complaint which added claims of negligence against the defendants.  Defendants made a motion to dismiss the negligence claims, arguing that the Illinois parental immunity doctrine shielded them from liability for negligent conduct because they stood 
in
 
loco
 
parentis
 with regard to Waketta.

The trial judge granted defendants' motion to dismiss and indicated the following:

"Well, I am satisfied that Maryville was responsible for the day-to-day care and supervision of this child, since the child was living in their facility.

It's clear to me that they certainly had to consult with DCFS on certain matters but not on the day-to-day responsibilities.  One of those responsibilities that Maryville had was to discipline this child when necessary.

I am convinced from the cases that the defendants have tendered to me, and from the arguments made, and everything that I know about the case that Maryville was acting de facto as loco parentis for this child.

Therefore, the motion to strike Counts I and III for ordinary negligence – that are based on ordinary negligence, that motion will be granted.  I do not believe Maryville can be sued under theories of ordinary negligence."

Following a subsequent jury verdict in favor of defendants on plaintiff's willful and wanton counts, plaintiff appealed the trial court's dismissal of the negligence counts.  This court, in a split opinion, reversed the trial court, finding that the trial court had improperly granted defendants' motion to dismiss.  
Wallace v. Smyth
, 301 Ill. App. 3d 75, 81, 703 N.E.2d 416 (1998).  The defendants appealed to the Illinois Supreme Court.  In an October 4, 2000, order, the supreme court denied defendants' petition for leave to appeal and, exercising its supervisory authority, remanded the case back to this court for additional consideration in light of 
Nichol v. Stass
, 192 Ill. 2d 233, 735 N.E.2d 582 (2000).  
Wallace v. Smyth
, 191 Ill. 2d 562, 735 N.E.2d 1001 (2000).

On remand, the parties have filed briefs addressing the impact of 
Nichol
 on our previous opinion.  In addition, a joint 
amici
 
curiae
 brief in support of plaintiff has been filed by the Cook County public guardian, the Children and Family Justice Center of the Northwestern University School of Law, the CIVITAS Childlaw Center of the Loyola University Chicago School of Law, the Illinois Trial Lawyer's Association, and the law firms of Cochran, Cherry, Givens, Smith & Montgomery, L.L.C., and the Clifford Law Offices.  The Child Care Association of Illinois has filed an 
amicus
 
curiae
 brief in support of defendants.

Prior to 
Nichol
, our supreme court had most recently focused on the parental immunity doctrine in 
Cates v. Cates
, 156 Ill. 2d 76, 619 N.E.2d 715 (1993).  In 
Cates
, 156 Ill. 2d at 77, a negligence action was brought against the defendant father on behalf of his four-year-old daughter, who was injured while she was a passenger in an automobile driven by defendant.

The supreme court addressed whether summary judgment had been properly granted to the defendant father on the basis of the parent-child immunity doctrine.  The supreme court first examined the history of the immunity doctrine.  The court noted that previous case law had established that while the doctrine barred children from suing parents for negligence, actions alleging willful and wanton misconduct had been allowed.  See 
Cates
, 156 Ill. 2d at 81-85.  The court then analyzed and rejected two long-standing policy justifications for the doctrine.  
Cates
, 156 Ill. 2d at 92-103.  The court concluded, however, that the doctrine continued to be viable and was supported by a concern that courts should not be involved in deciding matters between parent and child  concerning decisions those persons are uniquely equipped to make because of that relationship.  
Cates
, 156 Ill. 2d at 103.  Those matters included decisions involving parental discretion in discipline, supervision, and care.
  The court thus held that the proper judicial inquiry in determining whether parental immunity should apply in a particular case is whether "the alleged conduct concerns parental discretion in discipline, supervision and care of the child."  
Cates
, 156 Ill. 2d at 104.  Applying the above standard to the facts before it, the court held that because the duty the defendant father owed in operating his automobile was owed to the general public rather than to his child, the concerns underlying parental immunity were not implicated and the child could maintain an action against the father for the negligent operation of the car.  
Cates
, 156 Ill. 2d at 106.

In 
Nichol
, 192 Ill. 2d at 234, two-year-old Jonathon Nichol drowned in a toilet while in the care of defendants John and Bonnie Stass, his foster parents.  Nichol's estate brought an action alleging that the foster parents had negligently violated various duties imposed by the common law and administrative regulations.  On the motion of the foster parents, the trial court dismissed the plaintiff's action against the foster parents.  The appellate court affirmed the dismissal, finding that the foster parents should be considered agents of the state and could therefore assert the protection of the sovereign immunity doctrine.  192 Ill. 2d at 236.  Before the Illinois Supreme Court, the foster parents argued for the first time that they should be shielded from liability by the doctrine of parental immunity.  
Nichol
, 192 Ill. 2d at 243-44.  The majority in 
Nichol
, 192 Ill. 2d at 244, first noted that the court, in 
Cates
, had "reevaluated the doctrine of parental immunity" and had abrogated its application in a limited number of circumstances.  Immunity survived where the conduct involved was inherent to the parent-child relationship.  
Nichol
, 192 Ill. 2d at 244.

The court
 went on to conclude that "a limited form of parental immunity should be available in negligence actions against foster parents."  
Nichol
, 192 Ill. 2d at 244.  The court noted: "although the relationship between foster parents and foster children is not identical with the relationship between biological parents and their children, we believe that it would be anomalous to reject some form of the defense in these circumstances.  The rationale identified by the 
Cates
 court as justifying the retention of some portion of the doctrine -- the preservation of parental authority and discipline [citation] -- is also applicable in the foster parent setting.  Although foster parents receive compensation for their role, they exercise a substantial amount of discretion in discipline, supervision, and care, areas in which 
Cates
 found immunity to be appropriate."  
Nichol
, 192 Ill. 2d at 244-45.

The court also relied on the legislature's grant of a limited form of parental immunity to teachers as support for the extension of a qualified form of parental immunity to foster parents.  The court stated:

"Like teachers, foster parents receive compensation for their work.  Moreover, the relationship between a foster parent and a foster child, like the relationship between a teacher and a student, is not permanent and may even be relatively brief.  Yet foster parents, like teachers and biological parents, are responsible for a broad range of decisions affecting the vital interests of the children involved.  It would be anomalous to grant a qualified immunity to educators and biological parents but to deny immunity entirely to foster parents, who, in their relationships with their foster children, share many important similarities with the others.  Thus, it can be seen that our result in this case does not represent an undue expansion of the immunity doctrine; rather, our holding is entirely consistent with this court's previous decisions recognizing immunity for persons who stand 
in
 
loco
 
parentis
 to children."  
Nichol
, 192 Ill. 2d at 246. 

The court also emphasized that parental immunity should not be available when the underlying conduct resulted in the revocation of a foster parent's license or a finding of neglect, or when it is the subject of a criminal charge.  
Nichol
, 192 Ill. 2d at 246-47.  Nor should immunity be available where it would override DCFS regulations to the contrary.  
Nichol
, 192 Ill. 2d at 247.

As noted above, the supreme court has remanded the instant case to this court for additional consideration in light of 
Nichol
.  We must thus consider whether, in light of 
Nichol
, the parental immunity doctrine can immunize defendants in the instant case from liability for negligence.  The defendants in this case happen to be a residential childcare institution and its employees and/or agents
.  Therefore, the broader question to be addressed is whether a residential childcare institution, such as defendant Maryville, and its agents and employees, are distinguishable in any significant way from the foster parents who were found to have limited immunity in 
Nichol
.

In our original opinion, we stated that before parties can be considered 
in
 
loco
 
parentis
, they must assume the usual financial burdens of parenthood.  
Wallace
, 301 Ill. App. 3d at 79-80.  We went on to note that pursuant to the Illinois Administrative Code, DCFS has legal and financial responsibility for children of whom it is guardian, regardless of their momentary location.  
Wallace
, 301 Ill. App. 3d at 80-81.

In 
Nichol
, 192 Ill. 2d at 244, the supreme court held that a limited form of parental immunity should be available in negligence actions against foster parents.  In so holding, the court noted that "[a]lthough foster parents receive compensation for their role, they exercise a substantial amount of discretion in discipline, supervision, and care, areas in which 
Cates
 found immunity to be appropriate."  
Nichol
, 192 Ill. 2d at 245.  The court also found that legislative application of the parental immunity doctrine to teachers supported its extension of a limited form of the doctrine to foster parents.  The court noted that teachers, like foster parents, receive compensation for their work.  
Nichol
, 192 Ill. 2d at 246.  In light of 
Nichol
, we can no longer say that the assumption of the "usual financial burdens of parenthood" is a prerequisite to finding that a party stands 
in
 
loco
 
parentis
 and may be entitled to a limited form of parental immunity.

Nor does the temporary nature of Waketta's 90-day placement at Maryville create a bar to a finding of 
in
 
loco
 
parentis
.  The court in 
Nichol
 found that a limited form of parental immunity applied to foster parents despite the fact that "the relationship between a foster parent and a foster child, like the relationship between a teacher and a student, is not permanent and may even be relatively brief."  
Nichol
, 192 Ill. 2d at 246; see also 
Wallace
, 301 Ill. App. 3d at 83 (Burke, J., dissenting) (arguing that, unlike children in facilities such as summer camps and day-care centers, each residential placement of a ward of the state is a permanent placement because "the ward will always be in placement somewhere, each placement is where the child's 'family' is, and it is to another placement that a ward is 'returned to,' rather than to the parents").

In our original opinion, we distinguished the fact that teachers, in certain circumstances, are 
in
 
loco
 
parentis
 to students on the basis that such status was conferred by legislative enactment.  The court in 
Nichol
, 192 Ill. 2d at 246, however, appeared to be untroubled by the distinction, instead holding that where teachers, biological parents, and foster parents were all responsible for a broad range of decisions affecting the vital interest of children, it would be anomalous to grant a qualified immunity only to the former two.

Plaintiff and the parties to the 
amici
 
curiae
 brief filed in support of plaintiff argue that 
Nichol
 is limited to negligence actions against foster parents.  They argue that to extend a limited form of parental immunity to institutions such as Maryville and its agents and employees would be contrary to the holding in 
Nichol
 in that such an extension would do nothing to further the parent-child relationship and conduct inherently associated with that relationship.  They also contend that defendants did not exercise parental discretion over the areas found by 
Nichol
 and 
Cates
 to be appropriate for immunity.

The court in 
Cates
, 156 Ill. 2d at 104, held that the proper judicial inquiry in determining whether parental immunity should apply in a particular case is whether "the alleged conduct concerns parental discretion in discipline, supervision and care of the child."  The court in 
Nichol
 noted that the preservation of parental authority and discipline was the rationale identified in 
Cates
 as justification for retention of limited parental immunity, and then found those concepts applicable to the foster parent setting.  Again referencing 
Cates
, the court held that where foster parents exercised a substantial amount of discretion in discipline, supervision, and care, the extension of limited parental immunity to such parents was appropriate.  
Nichol
, 192 Ill. 2d at 245.

The similarities between foster parents and defendants are obvious.  The wards that foster parents and facilities such as Maryville provide care for are both under the ultimate legal and financial control of DCFS.  Further, both foster parents and Maryville assume physical custody of the minors in their care.  They both provide day-to-day housing, care, medical attention, supervision, and discipline to those in their care pursuant to extensive DCFS regulations.  Those are exactly the types of duties and responsibilities found in 
Cates
 and 
Nichol
 to be inherent to the parent-child relationship.  The limitations on Maryville's discretion cited by plaintiffs, such as having to obtain permission from DCFS prior to administering psychotropic medication or taking Waketta on a two-week-long out-of-state field trip, are not appreciably different from the limitations placed on foster parents.  The 
amici
 brief filed in support of plaintiff notes that the court in 
Nichol
 failed to "even suggest the possibility of conferring" immunity on residential childcare institutions such as Maryville.  We are untroubled by that omission, considering the question was not before the court in 
Nichol
.  Nor are we persuaded by the
 attempts in the 
amici
 brief supporting plaintiff to distinguish foster parents from residential care facilities.  Both 
Cates
 and 
Nichol
 make clear that what matters most for purposes of extending immunity is whether the party to whom it is being extended exercises a substantial amount of parental discretion in discipline, supervision, and care of minors.  One need look no further than the discussion in 
Nichol
 of the legislature's grant of a qualified form of parental immunity to teachers to realize that the emphasis of analysis in this area is the similarities shared by the persons possessing immunity rather than their differences.  Keeping in mind their similarities, we cannot say that there is a meaningful difference between foster parents and residential childcare institutions such as Maryville so as to preclude the limited form of parental immunity discussed in 
Cates
 and 
Nichol
 from applying to such institutions and those who work there.

The parties to the 
amici
 brief supporting plaintiff maintain that the public policy of protecting activity that is inherently or intimately connected to the parent-child relationship will not be served by extending immunity to residential childcare institutions.  We note that the protected areas of activity according to the court in 
Cates
 were matters involving parental discretion in discipline, supervision, and care.  Clearly, the facts of the instant case involve the discipline, supervision, and care of a state ward living full time at a residential facility.

The plaintiff and parties to the 
amici
 brief supporting plaintiff argue that the extension of parental immunity to residential childcare facilities would be contrary to trends, in Illinois and nationally, of narrowing or abolishing the doctrine.  Our supreme court, in 
Cates
, has already addressed national trends and the history of the doctrine in Illinois.  The court concluded that the continued existence of the doctrine was supported by certain public policy concerns, so long as the doctrine was primarily limited to conduct inherent in the parent-child relationship.  
Cates
, 156 Ill. 2d at 103-04.  Notably, the court, in so holding, did not specifically limit the application of the doctrine to biological parents.  To the contrary, the court apparently viewed the doctrine as evolving rather than static, noting that "the parent-child tort immunity doctrine was created by the courts and it is especially for them to interpret and modify the doctrine to correspond with prevailing public policy and social needs."  
Cates
, 156 Ill. 2d at 108.  It is evident from the record and briefs of the parties that there are a great number of children residing in substitute care situations throughout Illinois, many of whom are living in residential childcare facilities.  In many cases, these institutions and those employed by them have become, for all practical purposes, the parents to the children in their care.  As such, they make decisions each day regarding the discipline, supervision, and care of those in their care.  The same public policy considerations underlying the court's retention of the doctrine in 
Cates
 and the extension of limited immunity to foster parents in 
Nichol
 support the application of limited immunity to defendants in the instant case.

Having determined that parental immunity may apply to defendants, we turn now to the limitations placed on such immunity.  Pursuant to the limitations set forth in 
Nichol
, 192 Ill. 2d at 246-47, parental immunity should not be available where the underlying conduct resulted in the revocation of the license of a facility or a finding of neglect, or when it is the subject of a criminal charge.  
Nor should immunity be available where it would override DCFS regulations to the contrary.  
Nichol
, 192 Ill. 2d at 247.

Plaintiff asserts that defendants are not entitled to the limited form of parental immunity recognized in 
Nichol
 because they acted contrary to various DCFS regulations in their restraint of Waketta.  Plaintiff requests, in the alternative, that she be given the opportunity on remand to amend her complaint to allege facts which would avoid the application of limited parental immunity.  Defendants argue that the application of the parental immunity doctrine was adequately shaped by the parties at the trial court level and that this court should simply enter an order affirming the trial court's dismissal of plaintiff's negligence claims.

It is true that in the instant case, unlike in 
Nichol
, the issue of parental immunity was raised and ruled upon at the trial court level.  However, the trial court ruled upon this issue without the benefit of the supreme court's ruling in 
Nichol
.  The issue of limitations on the immunity doctrine as it applied to substitute care providers was thus not addressed.  Similarly, although plaintiff pled that the physical force employed by some of the defendants against Waketta was a negligent violation of certain DCFS regulations regarding administration of physical restraint, she did not do so with an awareness of the limitations placed on the application of the doctrine set forth in 
Nichol
.
(footnote: 1)  Because these issues were not fully addressed at the trial court level, we believe the most appropriate course of action is to remand this matter to the trial court.  On remand, plaintiff should be given an opportunity to replead her negligence counts to allege any facts that may act to defeat the application of parental immunity to defendants in this case.

Accordingly, upon reconsideration in light of 
Nichol
, we vacate our previous opinion in this case, 
Wallace v. Smyth
, 301 Ill. App. 3d 75, 703 N.E.2d 416 (1998).  We reverse the trial court's dismissal of counts I and III of plaintiff's second amended complaint and remand this case for further proceedings.  Upon remand, plaintiff should be given the opportunity to replead her negligence allegations should she so desire.

Reversed and remanded with directions.

BURKE, P.J., concurs.

JUSTICE CAHILL, dissenting:

I respectfully dissent.  The opinion in 
Nichol v. Stass
, 192 Ill. 2d 233, 735 N.E.2d 582 (2000), is a narrow one.  Relying on reasoning developed in 
Cates v. Cates
, 156 Ill. 2d 76, 619 N.E.2d 715 (1993), and 
Commerce Bank v. Augsburger
, 288 Ill. App. 3d 510, 680 N.E.2d 822 (1997), 
Nichol
 extends a limited form of parental immunity to foster parents.  The role of a natural parent and a foster parent in the life of a child is so often similar our supreme court concluded that it would be anomalous to reject a limited form of personal immunity for foster parents.  The immunity shields one person in his or her relationship with one child.   To now broaden limited immunity to include a corporation,  however dedicated, however essential its work, strikes me as a  public policy decision for the legislature.  I would not withdraw our original opinion in this case.

FOOTNOTES
1: 
We also note that the trial court did not comment on plaintiff's allegations that DCFS regulations had been violated in ruling on the parental immunity issue.  The trial court was under no obligation to do so at the time because 
Nichol
 had not yet been decided.