(No. 93144.—

SHANDOULIA WALLACE, Indiv. and as Adm'r of the Estate of Waketta Roy Wallace, Deceased, Appellant, v. JOHN P. SMYTH *et al.*, Appellees.

*Opinion filed December 19, 2002.—Rehearing denied March 31, 2003.*

FREEMAN, J., specially concurring.

Stanley L. Hill, of Chicago, for appellant.

Jeffrey Edward Kehl and Robert C. Yelton III, of Yelton & Kehl, Ltd., of Chicago (John C. O'Malley and Francis D. Morrissey, of counsel), for appellees.

Patrick T. Murphy, Cook County Public Guardian, of Chicago (Peter J. Schmiedel, Charles P. Golbert and Jill Runk, of counsel), for *amicus curiae* Office of the Cook County Public Guardian.

Bruce A. Boyer and Stacey E. Platt, of Chicago, for *amicus curiae* ChildLaw Center & ChildLaw Clinic of the Loyola University School of Law.

Robert A. Clifford, of Chicago, for *amicus curiae* Clifford Law Offices.

James D. Montgomery and Thomas C. Marszewski, of Chicago, for *amicus curiae* Cochran, Cherry, Givens, Smith & Montgomery, L.L.C.

Thomas F. Geraghty, of Chicago, for *amicus curiae*

Children & Family Justice Center of the Northwestern University School of Law.

James D. Montgomery and Thomas C. Marszewski, of Cochran, Cherry, Givens, Smith & Montgomery, and Bruce R. Pfaff, all of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

James A. Serritella and James C. Geoly, of Burke, Warren, MacKay & Serritella, P.C., of Chicago, for *amicus curiae* Illinois Child Care Association.

JUSTICE FITZGERALD delivered the opinion of the court:

The issue in this case is whether, in the wake of our decisions to retain a limited form of parental immunity in *Cates v. Cates*, 156 Ill. 2d 76 (1993), and to extend this immunity to foster parents in *Nichol v. Stass*, 192 Ill. 2d 233 (2000), the defendants, a residential child care facility and seven of its employees, enjoyed a similar immunity from the plaintiff's negligence claims after her son died in their care. We conclude that because the corporation-child relationship does not mirror the parent-child relationship, the defendants do not have parental immunity. We reverse the appellate court and the circuit court, and we remand for further proceedings.

## BACKGROUND

On June 12, 1989, the Illinois Department of Children and Family Services (DCFS) placed one of its wards, 12-year-old Waketta Roy Wallace (Roy), at Maryville Academy (Maryville) for a 90-day diagnostic assessment regarding his future placement. Maryville is a not-for-profit corporation that operates a licensed residential child care facility for state wards. In 1989, Maryville cared for approximately 500 children.

A month later, on July 11, 1989, Roy reported to the

office of Maryville program manager Paul Voltz after school. Voltz confronted Roy about sleeping in study hall. Roy made threatening gestures, and Voltz removed him to an adjacent hallway. Once there, Voltz summoned assistant program manager Laura Angelucci and family educator Jill Jacobe to assist him in restraining Roy. Family educator Jim Geidner also participated for a short time until his shift ended, when he was replaced by family educator Xavier Collier. Eventually, after a struggle, Roy was placed on his stomach with his arms crossed in front of his abdomen and his wrists held to the floor. The restraint continued for more than four hours and ended in Roy's death from positional asphyxia.

Roy's mother, Shandoulia Wallace, filed a four-count complaint in the circuit court of Cook County against Maryville, its executive director Reverend John Smyth, Voltz, Angelucci, Collier, Geidner, Jacobe, and nurse Dee LeBel. Wallace alleged that the defendants' negligence, and, alternatively, willful and wanton misconduct, proximately caused Roy's death. The defendants filed a motion to dismiss Wallace's negligence claims; they asserted the parental immunity doctrine shielded them from liability. The trial court agreed and dismissed these claims, stating: "I am convinced from the cases that the defendants have tendered to me, and from the arguments made, and everything that I know about the case that Maryville was acting de facto as loco parentis for this child. *** I do not believe that Maryville can be sued under theories of ordinary negligence." The case proceeded to trial on Wallace's willful and wanton misconduct claims. After a jury returned a verdict for the defendants, Wallace appealed the dismissal of her negligence claims.

The appellate court reversed. *Wallace v. Smyth*, 301 Ill. App. 3d 75 (1998). The court noted, "At common law, *in loco parentis* status belonged to persons who put

themselves in a parent's shoes by assuming all parental obligations toward a child without going through the formalities of legal adoption." *Wallace*, 301 Ill. App. 3d at 80. After reviewing Wallace's negligence allegations, the court rejected the defendants' argument that Wallace conceded they stood *in loco parentis* by pleading that Maryville was licenced by the state to house, care for, and educate children. *Wallace*, 301 Ill. App. 3d at 80. The court held that housing, caring for, and educating a child do not confer *in loco parentis* status. *Wallace*, 301 Ill. App. 3d at 80. According to the appellate court, teachers are *in loco parentis* with regard to students under the School Code, but no statutory equivalent exists to insulate an entity like Maryville against allegations that it negligently disciplined a child. *Wallace*, 301 Ill. App. 3d at 80-81. Rather, in conjunction with Illinois' statutory scheme, DCFS bore ultimate responsibility for traditional parental functions with regard to Roy. *Wallace*, 301 Ill. App. 3d at 81, citing 89 Ill. Adm. Code §§ 359.7, 359.9 (1996). The appellate court concluded that Wallace's allegations did not show Maryville stood *in loco parentis* to Roy and that the trial court improperly dismissed her negligence claims. *Wallace*, 301 Ill. App. 3d at 81.

The defendants filed a petition for leave to appeal. While this petition was pending, we decided *Nichol*. Accordingly, we denied the defendant's petition and remanded this cause to the appellate court for additional consideration in light of *Nichol*. See *Wallace v. Smyth*, 191 Ill. 2d 562 (2000).

On remand, the appellate court discussed both *Cates* and *Nichol* and stated:

"The similarities between foster parents and defendants are obvious. The wards that foster parents and facilities such as Maryville provide care for are both under the ultimate legal and financial control of DCFS. Further, both foster parents and Maryville assume physical custody of the minors in their care. They both provide day-to-day

housing, care, medical attention, supervision, and discipline to those in their care pursuant to extensive DCFS regulations. Those are exactly the types of duties and responsibilities found in *Cates* and *Nichol* to be inherent to the parent-child relationship. *** Both *Cates* and *Nichol* make clear that what matters most for purposes of extending immunity is whether the party to whom it is being extended exercises a substantial amount of parental discretion in discipline, supervision, and care of minors. *** [W]e cannot say that there is meaningful difference between foster parents and residential child care institutions such as Maryville so as to preclude the limited form of parental immunity discussed in *Cates* and *Nichol* from applying to such institutions and those who work there." 327 Ill. App. 3d 411, 419-20.

The court vacated its previous opinion and remanded to allow Wallace to amend her complaint and allege facts which would preclude parental immunity. 327 Ill. App. 3d at 421.

In dissent, Justice Cahill stated:

"The opinion in *Nichol* [citation] is a narrow one. *** *Nichol* extends a limited form of parental immunity to foster parents. The role of a natural parent and a foster parent in the life of a child is so often similar our supreme court concluded that it would be anomalous to reject a limited form of personal immunity for foster parents. The immunity shields one person in his or her relationship with one child. To now broaden limited immunity to include a corporation, however dedicated, however essential its work, strikes me as a public policy decision for the legislature." 327 Ill. App. 3d at 422 (Cahill, J., dissenting).

We allowed Wallace's petition for leave to appeal. See 177 Ill. 2d R. 315.[1]

---

[1]We granted leave to the Cook County public guardian; the Children and Family Justice Center of Northwestern University School of Law; the ChildLaw Center and ChildLaw Clinic of the Loyola University Chicago School of Law; the Illinois Trial Lawyers Association; Cochran, Cherry, Givens, Smith and

### ANALYSIS

A motion to dismiss under section 2—615(a) of the Civil Practice Law (735 ILCS 5/2—615(a) (West 2000)) tests the legal sufficiency of the plaintiff's claim, while a motion to dismiss under section 2—619(a) (735 ILCS 5/2—619(a) (West 2000)) admits the legal sufficiency of the plaintiff's claim, but asserts certain defects or defenses outside the pleading which defeat the claim. See *Provenzale v. Forister*, 318 Ill. App. 3d 869, 878 (2001); *Joseph v. Chicago Transit Authority*, 306 Ill. App. 3d 927, 930 (1999). Consistently with the designation the defendants gave to their motion to dismiss, the trial court considered the motion under section 2—615. This motion, however, should have been brought under section 2—619(a)(9) because the defendants argued that the plaintiff's negligence claim was barred by "other affirmative matter," namely, parental immunity. 735 ILCS 5/2—619(a)(2) (West 2000); see *Nichol*, 192 Ill. 2d at 235. We will address the merits of this appeal, despite the defendants' error, because Wallace has suffered no prejudice from the defendants' improper designation. See *Storm & Associates, Ltd. v. Cuculich*, 298 Ill. App. 3d 1040, 1047 (1998); see also *Janes v. First Federal Savings & Loan Ass'n of Berwyn*, 57 Ill. 2d 398, 406-07 (1974) (expressly disapproving of hybrid dismissal/summary judgment motions, but refusing to waste judicial resources by remanding for the defendants to correct their motion). Under either section, our standard of review is *de novo*. See *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116 (1993).

In this appeal, Wallace contends that the parental immunity doctrine does not extend to residential child care facilities because such entities do not have a parent-child relationship with the state wards in their care. By

Montgomery, L.L.C.; and the Clifford Law Offices to file a brief as *amici curiae* in support of Wallace. See 155 Ill. 2d R. 345.

contrast, the defendants contend that the doctrine protects any person or entity charged with the day-to-day care, supervision, and discipline of state wards, regardless of any familial relationship between the child and the person or entity. In the defendants' view, "the parental immunity doctrine follows the child."

The parental immunity doctrine, which blocks mere negligence claims, but not willful and wanton misconduct claims (see *Gerrity v. Beatty*, 71 Ill. 2d 47, 49 (1978), citing *Nudd v. Matsoukas*, 7 Ill. 2d 608 (1956)), was recognized in Illinois in *Foley v. Foley*, 61 Ill. App. 577 (1895). Nearly 100 years later, this court first discussed the doctrine at length in *Cates*. In *Cates*, a four-year-old girl was seriously injured in an automobile accident involving vehicles driven by her noncustodial father and another driver. The girl, by her mother, filed a negligence complaint against the other driver; she subsequently amended her complaint to add her father as a defendant. The father filed a summary judgment motion, asserting that the parental immunity doctrine blocked the girl's negligence claim against him. The trial court granted summary judgment to the father. The appellate court reversed and partially abrogated the doctrine in automobile negligence cases.

We affirmed the appellate court. *Cates*, 156 Ill. 2d 76. After concluding that this court had recognized the parental immunity doctrine in earlier cases (*Cates*, 156 Ill. 2d at 85), we turned to its history. The cases which created the doctrine relied on several public policy justifications: preservation of family harmony, preservation of family assets, and preservation of parental authority. *Cates*, 156 Ill. 2d at 88. We noted that the family harmony justification was no longer viable: "The focus has shifted to a concern with preventing litigation concerning conduct intimately associated with the parent-child relationship. *** [W]here that relationship

is not impacted, the policies supporting the doctrine lose their persuasive strength." *Cates*, 156 Ill. 2d at 98-99. We also noted that the family assets justification had become irrelevant with the proliferation of liability insurance. *Cates*, 156 Ill. 2d at 101-02. We observed that, today, the parental immunity doctrine is supported by other policy concerns:

"Courts should not be involved in deciding matters *between parent and child* which concern decisions which those persons are uniquely equipped to make *because of that relationship*; to allow otherwise would unnecessarily and obtrusively inject courts into family matters which they are ill-equipped to decide. Such matters, by definition, involve parental discretion in discipline, supervision and care. *** [T]hose underlying policies ought to determine the scope of the immunity." (Emphases added.) *Cates*, 156 Ill. 2d at 103-04.

In short, we focused on both the nature of the conduct and the nature of the relationship. *Cates*, 156 Ill. 2d at 103. The central inquiry, thus, is whether the allegedly negligent conduct is conduct intimately associated with the parent-child relationship—such as the care, supervision, and discipline of a child. *Cates*, 156 Ill. 2d at 104. As we observed, "These limited areas of conduct require the skills, knowledge, intuition, affection, wisdom, faith, humor, perspective, background, experience, and culture *which only a parent and his or her child can bring to the situation*; our legal system is ill-equipped to decide the reasonableness of such matters." (Emphasis added.) *Cates*, 156 Ill. 2d at 105. We concluded that operating a motor vehicle is not such conduct; accordingly, parental immunity did not block the girl's negligence claim against her father. *Cates*, 156 Ill. 2d at 106.

More recently, in *Nichol*, we addressed the issue of who, in addition to biological parents, may claim this immunity. There, the biological parents of a two-year-old child who drowned in a toilet filed a negligence complaint

against the child's foster parents, in whose home the accident occurred. The foster parents filed a motion to dismiss, asserting that they enjoyed sovereign immunity as state employees. The trial court granted the motion, and the biological parents appealed. The appellate court affirmed, and the biological parents appealed to this court. Before us, the foster parents again claimed sovereign immunity, and, as further support for the appellate court's judgment, claimed parental immunity.

We rejected the sovereign immunity argument, but accepted the parental immunity argument:

> "[A]lthough the relationship between foster parents and foster children is not identical with the relationship between biological parents and their children, we believe that it would be anomalous to reject some form of the [parental immunity] defense in these circumstances. The rationale identified by the *Cates* court as justifying the retention of some portion of the doctrine—the preservation of parental authority and discipline [citation]—is also applicable in the foster parent setting. Although foster parents receive compensation for their role, they exercise a substantial amount of discretion in discipline, supervision, and care, areas in which *Cates* found immunity to be appropriate." *Nichol*, 192 Ill. 2d at 244-45.

Accord *Commerce Bank v. Augsburger*, 288 Ill. App. 3d 510, 517 (1997) ("Foster parents are nearly as much in need of leeway [in regard to the supervision and discipline of those children under their care] as are natural parents").

We compared teachers, who enjoy statutory immunity under the School Code, to foster parents. Like teachers and biological parents, foster parents remain responsible for "a broad range of decisions affecting the vital interests of the children involved." *Nichol*, 192 Ill. 2d at 246. We noted, however, that parental immunity in this context is tailored to the peculiar circumstances of the foster parent-child relationship. *Nichol*, 192 Ill. 2d at 246. Parental immunity is not available to foster parents

when the allegedly negligent conduct results in a revocation of their license, a finding of neglect, or a criminal charge; it also cannot override any DCFS regulations. *Nichol*, 192 Ill. 2d at 246-47. We reversed and remanded to allow the plaintiffs to amend their complaint to allege facts that would defeat parental immunity. *Nichol*, 192 Ill. 2d at 248.

The defendants assert that foster parents and residential child care facilities are no different. At trial, Father Smyth even characterized Maryville as "a very large foster home for the children who are dependent and neglected [and abused]." According to the defendants, foster parents and facilities like Maryville are trained to provide day-to-day care for state wards, and both should receive immunity. The defendants contend that we have refined the parental immunity doctrine to shield persons and entities who perform parental functions and exercise parental functions, without regard for the existence of a "filial or pseudo-filial relationship."

We disagree. The *Cates* standard "focuses primarily on conduct *inherent to the parent-child relationship.*" (Emphasis added.) *Cates*, 156 Ill. 2d at 105. Clearly, neither the conduct nor the relationship is the sole consideration. Both remain important in determining who is cloaked with immunity. That is, application of the doctrine depends upon more than the performance of so-called "parental" responsibilities; we also consider whose performance is at issue. See *Gulledge v. Gulledge*, 51 Ill. App. 3d 972, 974 (1977) ("the rationale behind the [parental immunity] rule loses its persuasive force as one considers situations involving other than the actual parent"); see also *Cates*, 156 Ill. 2d at 99 ("where the family relationship is dissolved or where that relationship has ceased to exist with respect to conduct giving rise to the injury, the immunity will not be applied").

Consequently, we conclude that, while the parental

immunity doctrine logically reaches foster parents, it cannot stretch to cover a corporate entity and its employees. The employees of a residential child care facility like Maryville exercise their professional duties in handling state wards; they are not parents, however similar their responsibilities. See *Cates*, 156 Ill. 2d at 105. As Wallace notes in her brief, a biological parent or foster parent does not discipline a child by means of a four-hour restraint, pinning the child to the floor with the assistance of three additional adults. The fact that Maryville employees were ordered to participate in the restraint by the program manager, and later replaced each other during the restraint, underscores the institutional nature of Maryville's response.

We recognize that the parental immunity doctrine is a judicial creation (see *Nudd*, 7 Ill. 2d at 619; accord *Cates*, 156 Ill. 2d at 108), but we note that only the legislature has provided parental immunity to individuals who are not parents or foster parents (see 105 ILCS 5/24—24, 34—84a (West 2000) ("In all matters relating to the discipline in and conduct of the schools and the school children, [educators] stand in the relation of parents and guardians to the pupils"); *Arteman v. Clinton Community Unit School District No. 15*, 198 Ill. 2d 475, 480 (2002) (sections 24—24 and 34—84a of the School Code grant educational employees the same immunity enjoyed by parents); *Gerrity*, 71 Ill. 2d at 51; *Kobylanski v. Chicago Board of Education*, 63 Ill. 2d 165, 173 (1976); see also *Possekel v. O'Donnell*, 51 Ill. App. 3d 313, 319 (1977) (holding that the immunity under the School Code does not extend to private day-care centers, nursery schools, and kindergartens governed by the Child Care Act)). We decline to extend the immunity to a corporate entity, even one whose purpose and history demonstrate the noblest motives. The corporation-child relationship simply does not mirror the parent-child

relationship. Consequently, the defendants do not enjoy parental immunity.

## CONCLUSION

For the reasons we have discussed, we reverse the judgment of the appellate court, reverse the judgment of the trial court, and remand to the trial court for further proceedings.

*Appellate court judgment reversed;*
*circuit court judgment reversed;*
*cause remanded.*

JUSTICE FREEMAN, specially concurring:

I agree that Maryville Academy and its employees (hereinafter Maryville Academy) may not invoke parental immunity as a defense to plaintiff's action. Thus, I concur in the result reached by the majority. However, I disagree with the analysis the majority uses in arriving at its decision. In my opinion, *Nichol v. Stass*, 192 Ill. 2d 233 (2000), which extended a limited form of parental immunity to foster parents in negligence actions, is controlling. Foster parents and institutions, such as Maryville Academy, that provide care to wards of the state should be treated the same. Like foster parents, these institutions assume physical custody of the ward and provide housing, food and medical care to the ward. The institutions supervise and discipline the ward, as do foster parents. Also, both foster parents and the institutions are subject to supervision and regulation by DCFS. Lastly, foster parents and the institutions receive financial reimbursement for the services they provide.

I also believe, however, that *Nichol* was wrongly decided. I dissented in *Nichol*, 192 Ill. 2d at 253-73 (Freeman, J., dissenting), because there are fundamental differences in the relationship between a foster parent and foster child and the relationship between a biological parent and child that militate against extension of

parental immunity to foster parents. In my dissent, I noted that all foster parents, whether supervised directly by DCFS or supervised by a child welfare agency, are subject to DCFS licensing requirements, must participate in DCFS training programs, must maintain records required by DCFS, must provide access to DCFS, and must comply with DCFS standards relating to the appearance, cleanliness and safety of the facility; the discipline of children at the facility; and the provision of care to children at the facility. I also noted that foster parents are entitled to reimbursement from the state for the services they provide to foster children. Foster parents do not stand *in loco parentis* to foster children because foster parents do not take upon themselves the financial obligations of a parent. Lastly, I sounded a cautionary note regarding the majority's holding:

"By its holding today, the majority has eliminated the requirement that one who stands *in loco parentis* must assume financial responsibility for the child. The majority has redefined the term *in loco parentis*. The implication in the present case is that the Stasses may invoke the doctrine of parental immunity to bar an action for negligent supervision of Jonathan Nichol. The majority opinion, however, may have unintended consequences. As noted by the appellate court in *Wallace* [*v. Smyth*], 301 Ill. App. 3d [75], 80, housing, care and education are also provided by summer camps, day-care centers, medical and psychological treatment facilities, grandparents and other relatives of a child. Do these persons or entities also stand *in loco parentis* to a child? Should the *Wallace* court have held that the [Maryville Academy] and counselors stood *in loco parentis* to the child placed in their care? Moreover, use of the term *in loco parentis* is not restricted to the area of foster care or education. Under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 1998)) death benefits are payable to a child to whom the deceased employee stood *in loco parentis*. A parent, or one who stands *in loco parentis* to a child, may be guilty of the offense of contributing to the dependency or neglect of the child. 720 ILCS 130/2 (West

1998). By redefining the term *in loco parentis*, the majority opinion may have an impact on diverse areas of the law."
*Nichol*, 192 Ill. 2d at 272-73 (Freeman, J., dissenting).
Thus, in my dissent, I anticipated that other providers of care would claim immunity in negligence actions filed against them. I felt strongly that these providers and foster parents are not entitled to parental immunity.

The present case offered this court an opportunity to reconsider the holding in *Nichol*. To do so would have been helpful to persons bringing actions on behalf of children hurt by providers of care, whether these providers be foster parents or institutions such as Maryville Academy. These providers would not be able to claim parental immunity as a defense in actions filed against them. Further, reconsideration would have safeguarded precious judicial resources since our courts would not be faced with claims of parental immunity by other care providers. The majority fails to grasp this opportunity, however. Instead, the majority relies on an artificial distinction between foster parents and Maryville Academy. The majority apparently bases this distinction on the assistance of additional adults in disciplining the child. Can this court then assume that a foster parent could not enlist the help of other adults in the foster home (or even other children in the foster home) in disciplining a particular minor? In my opinion, this court cannot do so.

Because the majority has refused to reconsider the holding in *Nichol*, our courts will inevitably be faced with claims of parental immunity by other care providers, leading to delay in recovery for wrongs perpetrated against minor wards of this state and a waste of precious judicial resources. I, for one, continue to believe that *Nichol* was wrongly decided. I also believe the present case is controlled by *Nichol*. This court should reconsider the holding in *Nichol* rather than create an unreal distinction between foster parents and Maryville Academy. For these

reasons, I cannot join in the majority opinion, although I concur in the result reached.