SIXTH DIVISION
September 28, 2007

No. 1-06-0523

| | | |
|---|---|---|
| FINANCIAL FREEDOM, f/k/a Unity, | ) | |
| Mortgage Corporation., d/b/a The Reverse | ) | Appeal from the |
| Mortgage Company | ) | Circuit Court of |
| | ) | Cook County, Illinois, |
| Plaintiff-Appellee, | ) | County Department, |
| | ) | Chancery Division. |
| | ) | |
| | ) | No. 02 CH 16900, |
| v. | ) | consolidated with cause |
| | ) | 05 CH 13128 but |
| | ) | deconsolidated 9/22/05 |
| | ) | |
| | ) | |
| MABEL A. KIRGIS, UNITED STATES OF | ) | Honorable |
| AMERICA DEPARTMENT OF HOUSING | ) | Clifford L. Meacham, |
| AND URBAN DEVELOPMENT, | ) | Judge Presiding. |
| UNKNOWN HEIRS AND LEGATEES OF | ) | |
| MABEL A. KIRGIS, RAYMOND KIRGIS JR., | ) | |
| MARY SCHOLZE, PATRICIA BISHOP, | ) | |
| UNKNOWN OWNERS AND NON-RECORD | ) | |
| CLAIMANTS, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Plaintiff, Financial Freedom, f/k/a Unity Mortgage Corp., d/b/a/ the Reverse Mortgage

Co., filed a complaint to foreclose a reverse mortgage against numerous defendants including the

deceased mortgagor/borrower, Mabel A. Kirgis (Mabel), and her son, Raymond Kirgis Jr.

(Raymond). Raymond filed a motion to dismiss pursuant to section 2-619 of the Code of Civil

Procedure (Code) (735 ILCS 5/2-619(6) (West 2002)) contending that the circuit court lacked

1

subject matter jurisdiction because the foreclosure action had been filed against a deceased person and because it was time barred by the statute of limitations promulgated in section 18-12 of the Probate Act of 1975 (755 ILCS 5/18-12 (West 2002)). The circuit court denied Raymond's motion to dismiss but certified the questions presented in the motion for interlocutory appeal (155 Ill. 2d R. 308). On review, this court denied Raymond leave to appeal. Subsequently, Raymond answered plaintiff's complaint and raised three affirmative defenses: (1) that the circuit court lacked subject matter jurisdiction because plaintiff filed a suit against a deceased person; (2) that under section 18-12 of the Probate Act, the foreclosure action was barred because more than two years had passed since the decedent's death; and (3) that the mortgage was produced by fraud.[1] Plaintiff filed a motion for summary judgment arguing that there were no genuine issues of material fact as to any of Raymond's affirmative defenses, and the circuit court granted that motion. Raymond now appeals, contending (1) that his motion to dismiss should have been granted and (2) that plaintiff's motion for summary judgment should have been denied. For the reasons that follow, we affirm.

BACKGROUND

The record below reveals the following relevant facts and procedural history. On September 16, 2002, plaintiff, the mortgagee, filed a complaint to foreclose a reverse mortgage

---

[1]We note that the first two affirmative defenses raised by defendant encompass the same exact arguments he raised in his motion to dismiss.

against, *inter alia,* Mabel and her son Raymond upon belief that he was one of her heirs.[2]

According to the complaint, Mabel was the sole owner in fee simple of the real property known as 1244 Campbell Avenue, Chicago Heights, Illinois (property). The complaint alleged that Mabel executed a reverse mortgage instrument with plaintiff on May 9, 1997, securing a maximum of $184,500 in principal indebtedness with a pledge of the said property as collateral. According to the complaint, this mortgage instrument was recorded and registered with the Department of Housing and Urban Development on May 22, 1997. The complaint further alleged that the borrower was deceased and that, therefore, pursuant to paragraph 9(a) of the mortgage instrument "all sums owed were immediately due and payable," the principal balance on the note and mortgage being $84,385.19 plus interest, costs, advances and fees. Accordingly, the complaint requested, among other things, a judgement of foreclosure and sale and a personal judgment for deficiency in the event that the amount obtained through the foreclosure sale was insufficient to satisfy the debt.

In support of the allegations in the complaint, plaintiff attached a copy of the reverse mortgage instrument and the adjustable rate note. Pursuant to that instrument, plaintiff agreed to lend to Mabel the maximum amount of $184,500 in principal, from which Mabel could take advances and cash payouts during her lifetime, and which she was not obligated to repay until

---

[2]We note that the complaint also listed and joined as defendants all those who had an interest in or a lien on the mortgaged real estate, including "unknown defendants," and alleged that the rights of these defendants were subordinate to the plaintiff's mortgage.

after she either sold her property or died.[3] According to the instrument, in return Mabel

"mortgag[ed], grant[ed], and convey[ed]" to plaintiff the said property. The reverse mortgage

instrument was prepared by "Unity Mortgage Corp., d/b/a/ The Reverse Mortgage Co." Both the

mortgage instrument and the adjustable rate note were signed by "Mabel A. Kirgis by Raymond

W. Kirgis Jr., Attorney-in Fact."[4] Additionally, the mortgage instrument was publically notarized

by Kevin B. O'Rourke.        On October 21, 2002, defendant, Raymond, filed a motion to

dismiss the complaint pursuant to section 2-619 of the Code, as against himself, Mabel, and "all

unknown heirs and legatees of Mabel," contending that the circuit court lacked subject matter

jurisdiction over the cause because the suit was filed against a dead person. According to that

motion, the action was also time barred as it was filed on September 16, 2002, three years after

the decedent mortgagor's death, in contravention of the two-year statute of limitations prescribed

under section 18-12 of the Probate Act. In support of that contention, defendant attached the

medical certificate of Mabel's death indicating that she had died on June 23, 1999.

On January 7, 2003, plaintiff filed a response to defendant's motion to dismiss contending

that when it filed the complaint for foreclosure it was unaware of the mortgagor's death, and that

it became aware of the mortgagor's death only after the process server was unable to serve

---

[3]We also note that the mortgage instrument also expressly stated that the "[b]orrower shall

have no personal liability for payment of the debt secured by this Instrument," and that the

"[l]ender may enforce the debt only through sale of the [p]roperty."

[4]The second page of the adjustable note also bears the initials "M.A.K." and "R.K."

4

process on her.[5] In addition, plaintiff argued that the Probate Act's statute of limitations on claims applies only to the filing of claims seeking entry of a personal judgment, and not to foreclosure claims.

On March 4, 2003, the circuit court heard arguments and denied defendant's motion to dismiss. The circuit court also ruled that plaintiff was barred from any deficiency in the event that the foreclosure sale of the property was insufficient to satisfy its claims.

Upon defendant's subsequent motion, the circuit court certified the following question for interlocutory appeal:

"Does section 18-12 of the Probate Act, 755 ILCS 5/18-12, bar a mortgage foreclosure action on a secured lien where the sole mortgagor and sole obligor on the underlying promissory note died more than three years prior to the filing of the foreclosure action?"

---

[5] Defendant points out that plaintiff's complaint states otherwise, and in fact alleges Mabel's death. Defendant also notes that the process server made a sworn affidavit on September 24, 2002, indicating that he could not serve process because Mabel was dead. In his statement of facts, plaintiff explains this inconsistency by stating that "counsel who filed the foreclosure complaint and executed service of process, was not the same counsel as the one who handled the litigation, including prosecuting the motion for summary judgment," and that "there is nothing in the record explaining why *** the complaint filed 9/16/02, alleged [Mabel's] death, whereas plaintiff's process server reported as of 9/24/02 that he had recently learned that she had died, a fact previously unfamiliar to him."

No. 1-06-0523

This court, however, denied defendant leave to file that appeal. See Financial Freedom f/k/a Unity Mortgage Corp. d/b/a The Reverse Mortgage Co., v. Kirgis et al., No. 1-03-1849 (June 23, 2003).

On July 17, 2003, defendant filed an answer and raised three affirmative defenses to plaintiff's complaint. Defendant again contended that this action must be dismissed because (1) the court lacked subject matter jurisdiction where a party files suit against a deceased person; and (2) plaintiff's claim was time-barred by the two-year statute of limitations articulated in section 18-12 of the Probate Act. In addition, defendant asserted that the mortgage was procured by fraud. In support of this third affirmative defense, defendant alleged that the mortgage was "an integral part of a scheme brought by Senior Citizen's Remodeling, Inc., (SCR), to defraud the elderly." In support of this assertion, defendant argued that SCR came to Mabel's home, suggested certain repairs and improvements on her home, and recommended a reverse mortgage as the means of obtaining these repairs and improvements. According to defendant, SCR intended that Mabel rely on its statements and obtain the reverse mortgage. Defendant asserted that Mabel relied on SCR's assurances and borrowed money to make the repairs and improvements through a reverse mortgage agreement with plaintiff. According to defendant, SCR procured and used the plaintiff's predecessor mortgage company to finalize the transaction and to collect the payment. According to the record, the company that entered into the reverse mortgage agreement with Mabel was the "Unity Mortgage Co., d/b/a (doing business as) The Reverse Mortgage Co." It is unclear from the record whether plaintiff, which filed its claim as "Financial Freedom Senior Funding Corp. f/k/a (formally known as) Unity Mortgage Co., d/b/a

6

The Reverse Mortgage Co." is the same as the original reverse mortgage company, merely acting under a new name, or is in fact a purchaser of the original mortgage company.

On October 27, 2004, defendant filed an additional section 2-619 motion to dismiss plaintiff's complaint based upon a purported settlement agreement reached by the parties. In support of this contention, defendant attached a letter dated August 11, 2004 from plaintiff's counsel indicating that he had received verbal confirmation that defendant would accept plaintiff's settlement proposal.[6] On December 20, 2004, the circuit court voluntarily dismissed this section

---

[6]That letter was addressed to defendant's counsel, Susan M. Rentscheler, and was signed by plaintiff's attorney, William Maloney. In its entirety, the letter reads:

"As of this date, I have received verbal confirmation from representatives at Financial Freedom that they will accept your proposal for a new reverse mortgage which will accelerate upon sale or upon death of the survivor of Raymond and his wife (wife represented to be 75 years of age). The lender requires a new application and a new mortgage specifically detailing those events.

Additionally, Mr. Kirgis will be required to reimburse Financial Freedom from property taxes advanced by Financial Freedom.

Finally, Raymond Kirgis will be required to keep all taxes and insurance premiums current in the future.

I have instructed my client to forward loan application and loan origination documents for this purpose. I will contact you shortly."

2-619 motion.

On December 22, 2004, plaintiff, filed an amended complaint to foreclose mortgage solely in order to name Mary Scholze and Patricia Bishop as additional defendants, by "virtue of the fact that, upon information and belief, they are believed to be the heirs of Mabel A. Kirgis." The amended complaint also specifically alleged that Mabel did not execute the reverse mortgage instrument alone but, rather, that the instrument was executed on her behalf by her son Raymond.

On February 18, 2005, defendant filed an answer and affirmative defenses to plaintiff's amended complaint. Defendant admitted that the mortgage was executed by "Mabel A. Kirgis, by and through her agent-in-fact, Raymond Kirgis Jr.," and raised the exact same three affirmative defenses that he had raised in his answer to plaintiff's original complaint. (See above.)

On February 25, 2005, apparently without leave of court in presenting it, defendant also filed a counterclaim against plaintiff contending that plaintiff breached their settlement agreement.[7] According to the counterclaim, defendant and plaintiff had reached a settlement agreement, and defendant had repeatedly advised the court of the terms of such an agreement. However, rather than proceed on the agreement, according to the counterclaim, plaintiff demanded that defendant participate in the preparation of some kind of "application" pursuant to

---

[7] We note that there is no record citation for this counterclaim in defendant's brief and the document nowhere appears in defendant's appendix or in his table of contents. However, the counterclaim is part of the record below.

8

which he would supposedly be granted the loan already agreed to by the parties. The counterclaim contended that if defendant were forced to complete an additional application, he would have to satisfy a number of unstated contingencies not outlined in the original settlement agreement. In support of these contentions, defendant cited to Exhibit 1, a letter sent to defendant's attorney by counsel for plaintiff. That letter however, was not attached to the counterclaim and is not part of the record.[8]

On March 21, 2005, plaintiff filed a motion for summary judgment. In that motion, plaintiff contended that it had proved that its mortgage lien against Mabel's property was valid, subsisting and unsatisfied and that defendant's two affirmative defenses failed as a matter of law.

As to the third affirmative defense, plaintiff asserted that (1) the fraud alleged against SCR was too vaguely and incompletely pleaded; (2) there was no allegation of fraudulent misrepresentation by plaintiff or anyone else associated with plaintiff; and (3) that even if SCR had acted fraudulently, plaintiff was a *bona fide* purchaser for value that took its interest without notice of any fraud tainting SCR's dealing with Mabel.

In support of his motion for summary judgment, plaintiff attached 13 exhibits. These included: (1) the original complaint; (2) the process server's affidavit, sworn on September 24, 2002, and indicating that he could not serve process on Mabel because she "passed away on

_____

[8]We note, however, that for purposes of this appeal, it may be assumed that the letter cited to by defendant was the same letter that defendant attached as part of his second 2-619 motion to dismiss plaintiff's complaint on the basis of a breach of settlement agreement.

9

6/23/99"; (3) defendant's answer and affirmative defenses; (4) the order denying defendant's section 2-619 motion to dismiss; (5) the order certifying the question for interlocutory appeal; (6) the power of attorney appointing Raymond as Mabel's agent; (7) the "contract" entered into between SCR and Mabel for repairs to be done on her home for the sum of $15,000;[9] (8) a "settlement statement" by the Department of Housing and Urban Development signed by Raymond and showing that Mabel borrowed $55,000 from plaintiff's predecessor;[10] (9) the check used to pay SCR in the amount of $55,000, accompanied by an authorization from Mabel giving SCR permission to pick up her checks from plaintiff's predecessor and bring them to her; (10) a copy of plaintiff's business records listing all transactions that were made with respect to Mabel's account beginning with the inception of the loan; (11) an affidavit from plaintiff's attorney Sylvia Gotelli; (12) portions of the transcript of Raymond's deposition; and (13) an affidavit by plaintiff's attorney swearing to the veracity of all the exhibits attached.

As to the power of attorney, the document was dated May 9, 1997 and indicated that Raymond had the power to enter into, among other things, real estate, financial institution, borrowing, estate, and all other property transactions on Mabel's behalf.

As to the check for the repairs on Mabel's home, the check was for $55,0000 and was dated May 14, 1997, with "Republic Title Co., an Escrow Account," as the payor and Mabel as

---

[9]The record reveals that this "contract" contains no signatures by any of the parties.

[10]According to this document, the closing date was May 9, 1997, and the disbursement date was May 14, 1997.

the payee. The check was endorsed by "Raymond, on behalf of Mabel," and then paid to the order of SCR. The check was accompanied with an authorization from Mabel, titled "Attention: Republic Title," and giving SCR permission to pick up Mabel's checks from plaintiff's predecessor and bring them to her. This authorization form was also signed by Raymond.

In addition, plaintiff's business records with regard to Mabel's account included all transactions between May 14, 1997, and June 30, 2002, and showed (1) an advance in the amount of $55,000 disbursed on May 14, 1997; (2) a "Line of Credit" charge dated September 30, 1997; and (3) two "Property Taxes" transactions, one on May 13, 2002, in the amount of $4 and the other on June 4, 2002, in the amount of $11,782.27.

More importantly, in the sworn affidavit by Sylvia Gotelli, Gotelli swore that she was an employee of plaintiff and manager of the maturity department. Gotelli stated that plaintiff does not and never has had any affiliation with SCR. According to Gotelli, plaintiff never authorized SCR to act or make representations for or on its behalf. Gotelli also averred that plaintiff never had any knowledge of any false representations or misstatements of fact made by SCR employees concerning Mabel's loan. Gotelli also stated that plaintiff never had any knowledge regarding any "intentions of SCR and/or its representatives, including whether or not its workers did or intended to perform in a workmanlike manner and/or whether it did or intended to perform as represented in its written agreement."

Gotelli also stated that, although plaintiff's files include all communications relevant to Mabel's loan, from the inception of Mabel's loan through the present, they do not contain any communication (written or oral) from Mabel (or any of Mabel's representatives), made prior to

11

her death, regarding alleged fraud, misstatements of fact and/or alleged deception. Additionally, the files contain no communication of dissatisfaction or complaint from Mabel at the time of the borrower's second draw on this loan (in the sum of $14,000).

In addition, pages from Raymond's deposition made on May 6, 2004, established that from about 1994 through 1999, Raymond resided at the property together with his mother, Mabel, and with his wife. Raymond was the primary caregiver for Mabel, and after she died, he continued to live on the property with his wife, through 2004.

In his deposition, Raymond averred that SCR contacted his mother by telephone soliciting to have repairs done on her home. According to Raymond, his mother was interested because the home needed repair on the brick work, the siding of the house, the garage, the chimney, and the windows. Raymond testified that he was present when an individual from SCR came to the house to make estimates as to the amount that the repairs would cost. According to Raymond, the SCR representative walked around the house with Mabel and wrote down what Mabel wanted repaired and then next to that wrote the prices that SCR estimated these repairs would cost. Raymond identified the contract between SCR and Mabel as a one-page document listing these "estimates" and containing no signatures by any of the parties. According to Raymond, Mabel agreed to the terms that SCR indicated in that contract. According to Raymond, his mother was 84 years old but was mentally alert at the time she made the decision to do the home repairs based on SCR's "estimates."

Raymond also stated that an instrument giving him power of attorney to act on behalf of Mabel was made on June 19, 1994. He indicated that pursuant to this instrument, in 1997 when

12

Mabel was approached by SCR, he had power to sign her checks. According to Raymond, Mabel suffered from arthritis, and as a result, he sometimes wrote out checks for her, which she would then sign.

Raymond also testified that SCR "looked to" The Reverse Mortgage Co. to finance the remodeling of Mabel's home and that, after the SCR made the estimate on the home repairs, representatives of the mortgage company came directly to Mabel's home. According to Raymond, the estimated total value of the loan was to be $15,000.[11]

Raymond Kirgis testified that he photocopied three business cards from individuals he had dealings with in regard to the SCR repayments. These included two business cards of P. Richard Beem II, senior program representative of the "Reverse Mortgage Co./ Unity Mortgage Corp." and one business card of Nicholas L. Canellis, SRA, ASA, Appraiser Consultant of the American Society of Appraisers.

Raymond stated that Beem came to the house twice with all the loan documents and that, during the second meeting, the closing took place, at which he signed the reverse mortgage agreement on behalf of his mother. Raymond acknowledged his signature on three portions of the mortgage documents. He also stated that a check for $15,000 was then given by Beem to the

---

[11]Raymond also testified that his mother did not want to use the money she did have for the repairs and that she decided on a reverse mortgage because she was told by SCR representatives "not to worry," because she would not have to make any payments during her lifetime.

SCR representative, who was also present.

After being shown the "Settlement Statement" indicating that $55,000 was disbursed to his mother, Raymond stated that his mother never got the $40,000 difference. Soon thereafter, however, he changed his mind and stated that he did not know if she ever got the $40,000.

According to Raymond, a week after SCR was paid at the closing, SCR workers arrived to repair the house and worked on it for about a month. Raymond testified that the repairs were poorly done. Raymond stated that soon thereafter he was notified by the State's Attorney's office that SCR was being investigated for fraud against senior citizens. Raymond later learned that as a result of this investigation SCR was dissolved. He stated that he received a check in the sum of $109.59 from Richard Devine in the State's Attorneys office as a recoupment of the loss suffered through SCR's work.[12] Raymond also testified that he did not change the appearance of the house after the poor repairs completed by SCR and that he did not do so because of the State's Attorney's investigation.

Raymond was next questioned regarding the fact that, after the closing of the mortgage two subsequent draws (cash disbursements) were made on the loan (one in the amount of $14,000 and the other in the amount of approximately $12,000). Raymond indicated that he was unaware that Mabel made the $14,000 draw and the he made no written request for $14,000. Raymond also testified that he was not aware that the real estate taxes on the property had been

---

[12]Raymond could not recall but believed he may have received another check from the State's Attorney's office in the amount of approximately $100.

sold and were redeemed by plaintiff in 2002 for the approximate value of $12,000.

Raymond also testified that according to Mabel's will he inherited all her real property. According to Raymond, the will was never probated, and he took no steps to notify the lender of his mother's death. He also stated that in his lay opinion the house was worth around $200,000.

On July 5, 2005, defendant filed his response to the motion for summary judgment contending that summary judgment should be denied for the same reasons already set forth in his original motion to dismiss and additionally because there is a genuine issue of material fact as to whether Mabel and Raymond were fraudulently induced to enter into the reverse mortgage agreement in the first place. In support of this contention, defendant asserted that the testimony of Raymond at the deposition established that he and his mother were approached and sold the reverse mortgage loan by SCR, a company against which the Cook County State's Attorney later instigated a suit because of a scheme to defraud the elderly. According to defendant, at that time, SCR was purporting to be acting on behalf of plaintiff's predecessors and, in fact, had even advertised its repair services as involving a reverse mortgage ,which is the subject matter of this dispute. In support of this contention, defendant attached (1) portions of Raymond's deposition; (2) copies of Unity Mortgage representatives' business cards, identified in defendant's deposition; (3) a copy of an SCR advertisement; and (4) a copy of the letter he received from the State's Attorney's office with respect to SCR.

According to the portions of Raymond's deposition attached by defendant, Raymond testified that SCR "looked to" plaintiff's predecessor to finance its contracting work. Raymond also stated that at the second meeting Mabel's house included Beem, the representative of the

mortgage company, Cannelis and an individual from SCR.[13]  According to Raymond, Beem brought a check made out to SCR for $15,000 and said that SCR should be paid before the work was completed because that was how they "did business."  When Raymond questioned Beem about this practice, Beem again reassured him that this was common practice.  After Raymond signed the documents on behalf of his mother, Beem gave the $15,000 check to the SCR person.

According to the attached copy of an SCR advertisement, SCR was "a new federally insured and regulated program for senior citizens" that could help in home remodeling or in procuring extra money for holidays "with absolutely no monthly payments, for 'as long as [they] live.'" The advertisement also indicated that there were no credit requirements, income requirements or monthly payments for the services provided.

Moreover, according to the copy of a letter dated August 1, 2003, from the office of the State's Attorney addressed to Mabel, that office had successfully shut down SCR and sought as much restitution as possible to be returned to the victims of the company's "illegal business dealings."  The letter also enclosed a check from the State's Attorneys' office to be paid to Mabel in the amount of $109.55.

In addition, in his response to plaintiff's motion for summary judgment, defendant asserted that there was a genuine issue of material as to whether there was a settlement agreement

---

[13]Raymond also stated that Kevin O'Rourke could have been present at the house instead of Cannellis and that he could not recall which one was actually present because it had been almost seven years since the events he was describing had occurred.

16

between the parties which bars the action. Defendant specifically asserted that he was in the process of pursuing a counterclaim with respect to the same contention. In support of his allegation of a settlement agreement, defendant attached the affidavit of his attorney Ted A. Donner,[14] and the circuit court's order setting discovery cutoff at July 21, 2004.

_____

[14] In that affidavit, Donner swore that counsel for plaintiff never indicated to him that he lacked authority to represent his client with respect to the settlement of this matter. Donner's affidavit also indicated that in a letter dated August 11, 2004, sent by William E. Maloney, Jr., plaintiff's counsel, to Ms. Retscheler, defendant's counsel, Maloney indicated that he received verbal confirmation from plaintiff that they would accept her proposal for a new reverse mortgage. According to Donner, plaintiff's counsel confirmed both that he had written this letter and that he intended that it memorialize his client's willingness to accept a settlement agreement with defendant on such terms. Donner also averred that he then presented the same letter to the circuit court, with counsel present, and that both attorneys confirmed their understanding that an agreement had been reached and that it would be necessary to memorialize the same in the manner provided for in the letter. Donner stated that he reiterated to plaintiff's counsel and the court then and on numerous other occasions that defendant had agreed to the terms set forth in the letter. According to Donner, he "heard [the circuit] court say on at least three occasions that it was the court's understanding as well that an agreement had already been reached." Donner indicated that he sees nothing in the affidavit of plaintiff's counsel or in plaintiff's response that would refute the fact that he made the representations contained in the letter, or that plaintiff

No. 1-06-0523

On July 13, 2004, plaintiff filed a motion to strike defendant's counsel's affidavit, defendant's summary judgment exhibits and that portion of his summary judgment response brief arguing that his counterclaim, alleging breach of a purported settlement agreement, raises material questions of fact precluding the entry of summary judgment in plaintiff's favor. Plaintiff argued that defendant did not file a cognizable counterclaim because the counterclaim alleging the existence of, and breach of, a settlement agreement was filed without defendant having first sought and obtained leave of the circuit court to do so.

On August 4, 2005, defendant filed a complaint (in a separate cause, No. 05 CH 13128) for injunctive relief as against plaintiff seeking that plaintiff be required to abide by the settlement agreement.

The record next reveals that on August 16, 2005, defendant filed a motion to consolidate his complaint for injunctive relief (case No. 05 CH 13128) with plaintiff's mortgage foreclosure claim (case No. 02 CH 16900).[15] Plaintiff did not oppose the motion, and by order entered on August 24, 2005, the consolidation sought was granted and the new matter was assigned to the same judge.

_____

intended to withdraw from this agreement. Moreover, Donner stated that nothing in that letter required that defendant pay taxes before the agreement was in place.

[15]We note that although the motion itself is not file-stamped, the notice of filing bears the file stamp date of August 16, 2005.

18

On September 22, 2005, the circuit court granted the motion for summary judgment in favor of plaintiff and ordered a judgment of foreclosure. The court also ordered that the consolidated case be deconsolidated and returned for reassignment to the law division. In doing so, the court indicated that a written order would follow.

On September 27, 2005, plaintiff filed a motion to dismiss with prejudice defendant's newly filed complaint for injunctive relief contending that the contentions in plaintiff's complaint were entirely based on the same arguments already raised in defendant's counterclaim, which had been filed without leave. Plaintiff further contended that the complaint for injunctive relief was unverified and did not contain any copy of the purported settlement agreement between the parties. On the same date, plaintiff filed a motion for the imposition of sanctions against defendant's attorney for the bad-faith filing of the complaint for injunctive relief.

On October 13, 2005, a judgment for foreclosure and sale was entered. On November 1, 2005, the circuit court issued a written order as to the findings it made on September 22, 2005. In that order, the court first found that the following facts were undisputed:

"On or about May 9, 1997, Mabel A. Kirgis was the owner in fee of [the] *** property ***. On, or about the same date, Mabel entered into a reverse-mortgage transaction with Unity Mortgage Corp., d/b/a The Reverse Mortgage Company of Atlanta, Georgia, predecessor in interest to plaintiff, Financial Freedom Senior Funding Corp. Mabel borrowed the sum of $84,386.19 pursuant to the terms of the mortgage. Mabel died on June 23, 299. No probate estate has been opened. Paragraph 9(a)(I) of the mortgage requires that the debt be repaid on the borrower's death.

Plaintiff filed its foreclosure action of September 16, 2002. Raymond filed his answer on February 18, 2005. All knowing living persons with possible interest in or claims to the property have been added as defendants and properly served with process providing notice of this suit. The only party currently at issue is Raymond. The court has jurisdiction over the property and the parties, and may adjudicate their interests. The property has been occupied exclusively and continuously by Raymond and his wife from a period of approximately five years before Mabel's death until the present time.

According to plaintiff's business records, which have not been challenged by Raymond[,] the principal balance of the Kirgis loan is $84,385.19, accrued interest through June 16, 2005 is in the amount of $39,842.09, and advances for mortgage insurance, real estate taxes, property maintenance and inspection and monthly servicing fees total $21,742.29. The total balance claimed through June 16, 2005 is $145,969.57. Additional amounts have accrued since that date, including Attorney's Fees, and are recited in Attorneys' Certificate of Prove-up, Affidavit regarding fees, and Mortgagee's Affidavit regarding sum due"

The court ruled that it did not lack subject matter jurisdiction because this was a foreclosure proceeding. As the court stated:

"This proceeding is *in rem*. No deficiency is asserted and none may be maintained. Were [d]efendant's position accepted[,] foreclosure of a deceased individual's real property absent a probate proceeding would be an impossibility where no probate estate is opened. There is no precedent for this position ***."

The court also found that plaintiff's foreclosure was not time barred by operation of section 18-12(b) of the Probate Act because (1) the action was *in rem*; (2) no probate estate had been opened; and (3) section 18-12(d) was not a general statute of limitations, but a probate claims bar provision.

As to defendant's third affirmative defense, the court found that Raymond submitted "no admissible evidence" establishing or tending to support: (1) the inference that SCR fraudulently induced Mabel to enter into a reverse mortgage to finance SCR's work; (2) that SCR fraudulently induced Mabel to enter into the reverse mortgage transaction with plaintiff's predecessor; or (3) that plaintiff's predecessor acted as the agent of SCR in connection with the home repair contract or the reverse mortgage transaction. The court found that, instead, plaintiff's submitted affidavit contained "admissible evidence that there was and is no business, financial, agency or other relationship or connection between plaintiff's predecessor and SCR."

As to defendant's separate and collateral complaint, which it had ordered deconsolidated, the court found:

"Entry of the judgment of foreclosure precludes any injunctive relief for specific performance which is or may be sought in No. 05 CH 13128. Given that Raymond has not attached the Exhibit recited in his complaint, he was previously allowed leave to amend his complaint."

On January 26, 2006, a report of sale and distribution was entered. On the same date, the court entered a report approving the said report of sale and distribution, confirming the judicial

21

sale and ordering possession of the proceeds.[16]  Raymond now appeals.[17]

## II.  ARGUMENT

### 1.  Motion to Dismiss

On appeal defendant first contends that the trial court erred  when it denied his section 2-619 motion to dismiss plaintiff's initial foreclosure action because (1) the trial court lacked subject matter jurisdiction (see 735 ILCS 5/2-619(1) (West 2002)); and because (2) the foreclosure action was time barred (see 735 ILCS 5/2-619 (5) (West 2002)).  We disagree.

A motion to dismiss pursuant to section 2-619 admits the legal sufficiency of the complaint (*i.e.*, all facts well pleaded), but asserts certain defects, defenses or other affirmative matters that appear on the face of the complaint or are established by external submissions that act to defeat the claim.  Wallace v. Smyth, 203 Ill. 2d 441, 447 (2002).  The standard of review for an order granting a motion to dismiss pursuant to section 2-619 is *de novo*.  Tkacz v. Weiner, 368 Ill. App. 3d 610, 612 (2006).

Defendant first maintains that the court lacked subject matter jurisdiction because the suit was filed against a deceased person who has no interest in the debt, where the action is filed

---

[16]The amount for the total proceeds of the sale was $199,669.48.

[17]The notice of appeal is dated February 6, 2006, and indicates that defendant is appealing from the January 26, 2006 order requesting relief in the form of "a reversal of the order approving the sale of the subject real estate and directing the distribution of proceeds and reversal of the judgment of foreclosure in its entirety."

outside of the two-year probate statute of limitations, which allows for the filing of an action against a party defendant who has died before the lawsuit beings. Defendant asserts that section 13-209[18] of the Code of Civil Procedure (735 ILCS 5/13-209 (West 2002)) sets out the limitations period for the filing of an action against a party defendant who has died before the expiration of the applicable limitations period and against whom a cause of action survives, and

---

[18]Section 13-209(b) states, in pertinent part:

"If a person against whom an action may be brought dies before the expiration of the time limited for the commencement thereof, and the cause of action survives, and is not otherwise barred:

(1) an action may be commenced against his or her personal representative after the expiration of the time limited for the commencement of the action, and within 6 months after the person's death;

(2) if no petition has been filed for letters of office for the [decedent's] estate, the court, upon the motion of a person entitled to bring an action and after the notice to the party's heirs or legatees as the court directs and without opening an estate, may appoint a special representative for the deceased party for the purposes of defending the action. If a party elects to have a special representative appointed under this paragraph (2), the recovery shall be limited to the proceeds of any liability insurance protecting the estate and shall not bar the estate from enforcing any claims that might have been available to it as counterclaims." 735 ILCS 5/13-209(b) (West 2002).

incorporates the two-year limitations period contained in section 18-12(b) of the Probate Act.[19] Defendant contends that since plaintiff here did not file its foreclosure action within the two-year limit set out in section 18-12(b) of the Probate Act, it is barred from any recovery, because an action abates if it is filed against a dead individual after the statue of limitations in probate has ended without the appointment of a personal representative. For the reasons that follow, we disagree.

We find that these issues have already been subsumed by our supreme court's decisions in Waughop v. Bartlett, 165 Ill. 124, 129-30 (1896), and Markus v. Chicago Title & Trust Co., 373 Ill. 557, 565 (1940), and that we are bound to adhere to the principles therein enunciated.

In Waughop, the mortgagor under a certain mortgage had died. The note secured by a mortgage was not filed as a claim against her estate, even though the mortgaged property had been inventoried as part of the probate estate, but rather some six years after her death foreclosure proceedings were brought to foreclose the mortgage. Waughop, 165 Ill. at 127. In Waughop, the appellants contended that it was the duty of the holder of a note secured by a

---

[19]Section 18-12(b) of the Probate Act is entitled "Limitations on payment of claims" and states:

> "(b) Unless sooner barred ***, all claims which could have been barred under this [s]ection are, in any event, barred 2 years after decedent's death, whether or not letters of office are issued upon the estate of the decedent." 755 ILCS 5/18-12(b) (West 2002).

mortgage to present the debt in the probate court within two years after the filing of the letters testamentary as required by the Probate Act's statute of limitations. The appellants further asserted that failure to do so would bar the claim, except as to subsequently discovered assets not inventoried, which were exempt from the two-year limitations period under the language of the then-current Probate Act. Waughop, 165 Ill. at 127.

The supreme court disagreed, and held that the failure of the mortgagee to file his claim in the probate court within the two-year statute of limitations would not itself bar the foreclosure claim. Waughop, 165 Ill. at 127. In doing so, the court stated:

> "The section of the statute relating to the presentation of claims against the estate of a deceased person is not a general statue of limitation taking away all remedy, both personal and against the property of a person deceased. It is a specific act, adopted for the particular purpose of facilitating the early settlement of estates."[20] Waughop, 165 Ill.

---

[20]We note that both the United States supreme court and our supreme court have endorsed this principle (see Pufahl v. Parks' Estate, 299 U.S. 217, 228, 81 L.Ed. 133, 140, 57 S.Ct. 151, 157-58 (1936) ("[Illinois] Section 70 is not a general statue of limitations"); In re Estate of Bird, 410 Ill. 390, 396-97 (1951) (nonclaims statute "properly distinguished from a general statue of limitations"; nonclaims statue "does not totally bar claims, as do general statutes of limitations") and that our appellate courts have abided by it (see In re Estate of Newcomb, 61 Ill. App. 3d 1094, 1096 (1972) (nonclaims statue understood to be "not a general statue of limitations"); In re Estate of Baker, 48 Ill. App. 2d 442, 444 (1964), citing Waughop, 165 Ill.

25

at 128.

The court further found that "it [was not] incumbent on the holder of a note secured by a mortgage *** to probate his note when the maker is dead," and held that the mortgagee had a right independent of the remedy given him by filing a claim in the probate court to seek a foreclosure through an *in rem* proceeding so as to enforce his right against the property itself. Waughop, 165 Ill. at 129. The court reasoned that the debt claim against the property, through a mortgage foreclosure claim, was different from a personal liability action to collect the debt from the assets already inventoried in the estate and found that, unlike a personal deficiency judgment against the estate, the mortgage foreclosure claim was an *in rem* proceeding "independent of [any remedy given to the mortgagee] by filing his claim in the probate court." Waughop, 165 Ill. at 129. As the court stated:

> "Such a proceeding is not one against an estate nor is it one *in personam*. It is in the nature of a proceeding *in rem* to enforce certain security specially set apart for the indemnity of the holder of the note. In Karnes v. Harper, 48 Ill. 527, it is said (p. 529): 'In a proceeding to foreclose a mortgage in chancery the decree ascertains the sum due and orders the sale of the specific property for its satisfaction. It is in the nature of a decree *in rem*.'" Waughop, 165 Ill. at 129-30.

In doing so, the court acknowledged the old principle that "where the note is barred, the mortgage being but an incident to it, all right of action on the mortgage is also barred," but stated

---

124.

that, in an *in rem* proceeding, "the note is [nevertheless] not barred on account of the failure to probate it within two years" because the Probate Act's two-year filing limit is not a general statute of limitations. Waughop, 165 Ill. at 132. As such, the court concluded that the mortgage foreclosure claim could not be barred by the Probate Act's two-year statute of limitations, to the extent that it would reach the property specifically pledged by that debt and did not result in a deficiency judgment against the decedent and to any other property of the estate not specifically pledged. Waughop, 165 Ill. at 131.

In Markus, our supreme court reaffirmed the holding in Waughop and held that the dissolution of a corporation, "in legal effect, the same as the death of a natural person," did not destroy the mortgage lien on a corporate property and that the statute limiting suits against the corporation, its officers and stockholders to a period of two years after dissolution, although barring any remedy against the corporation, its officer or stockholders, did not bar foreclosure against the mortgaged property. Markus, 373 Ill. at 561-62. In so doing, the court recognized that the mortgagee's right to recover directly through a foreclosure sale is independent of his right to personally recover from the estate of the mortgagor and stated: "[T]he death of a mortgagor does not cancel his debt[,] and the mortgagee, if he so chooses, may disregard the [personal] liability of the mortgagor [on the note] and look solely to the security of the mortgage." Markus, 373 Ill. at 561. The court distinguished a personal remedy, through a judgment for deficiency, from a foreclosure action, indicating that if plaintiff desired recourse to property that is not specifically pledged as a security, he would be confined to the time limited by the statute for filing claims against the estate. Markus, 373 Ill. at 562. In other words, Markus held that even though

27

a personal claim could be barred by the statute of limitations, a claim against the property itself survived any limitations period. Markus, 373 Ill. at 562.

Defendant contends that Waughop is distinguishable because that case was decided in 1896 when our supreme court viewed a mortgage as a conveyance of title to the property in the mortgagee, whereas this "title theory" of mortgages has since been expressly rejected in favor of a "lien theory." In support of this decision, defendant cites to Harms v. Sprague, 105 Ill. 2d 215 (1984). We disagree.

We first note that both in Waughop and Markus our supreme court characterized the interest in the property as a "lien." See Waughop, 165 Ill. at 131 ("[w]hen appellant *** took this particular property he did so subject to all the *liens* existing"(emphasis added)); see also Waughop, 165 Ill. at 131 quoting Dodge v. Mack, 22 Ill. 93, 96 (1859) ("In each of these cases the creditor has acquired a *lien*, and the specific property has been appropriated, either by the debtor, or by the law, for its satisfaction, and the death of the debtor can in nowise affect the rights of the creditor" (emphasis added)); see also Markus, 373 Ill. at 562 ("it is quite a different thing to say that the *lien* of a mortgage on the property of the corporation would, by such delay, be discharged" (emphasis added)).

We further note that unlike in the present case, in Harms, to which defendant cites, neither the Probate Act's nonclaims statute nor any statue of limitations nor section 13-209 of the Code of Civil Procedure was the cause of the loss of the mortgage lien; rather, the operation of the right of survivorship alone produced that result. In Harms, the mortgagor was one of two owners of real property in joint tenancy with a right of survivorship. Harms, 105 Ill. 2d at 220. This

28

mortgagor, but not his joint tenant, mortgaged his one-half interest to a third party.  Harms, 105 Ill. 2d at 220.  After that mortgagor's death, the joint tenant filed a complaint to quiet title to the property as against the mortgagee.  Harms, 105 Ill. 2d at 220.  Our supreme court held that the mortgage did not survive as a lien on the surviving joint tenant's property.  Harms, 105 Ill. 2d at 224.  Granted, the supreme court in Harms reiterated its acceptance of the lien theory of mortgages under which an execution of a mortgage is not a separation of title, but only provides the mortgagee with a lien (see Harms, 105 Ill. 2d at 222-23 citing Kling v. Ghilarducci, 3 Ill. 2d 455, 460 (1954)).  However, contrary to defendant's contention, the extinguishment of the mortgagee's interest in Harms was not merely a result of the decedent's death but rather a result of the operation of the right of survivorship.  At the moment of death, by right of survivorship, the deceased joint tenant's mortgagor's interest vested in the survivor of them, the other joint tenant succeeding by operation of law to the decedent's interest, free of the mortgagee's lien interest.

Defendant also contends that Waughop is inapplicable because there has been a legislative change in the Probate Act since Waughop.  Specifically defendant contends that the Probate Act in existence at the time of Waughop provided:

"'All demands not exhibited within two years *** shall be forever barred, unless the creditors shall find other estate of the deceased not inventoried or accounted for by the executor or administrator, in which case their claims shall be paid *pro rata* out of such subsequently discovered estate.'" Waughop, 165 Ill. at 127, quoting Rev. Stats.__, ch. 3, par 70.

29

According to defendant, unlike that statute, the current Probate Act eliminates the exemption of noninventoried, subsequently discovered estates, and instead provides that "[e]*very claim* against the estate of a decedent *** is barred as to all of the decedent's estate," (emphasis added) (755 ILCS 5/18-12(a) (West 2002)) and that, "[u]nless sooner barred ***, *all claims* *** are, in any event, barred 2 years after decedent's death, whether or not letters of office are issued upon the estate of the decedent" (emphasis added) (755 ILCS 5/18-12(b) (West 2002)).

This argument does not accurately reflect the rationale of the holding in Waughop. While Waughop used the old statute as corroborative of its findings (see Waughop, 165 Ill. 2d at 128 ("[t]o hold that a claim is absolutely barred to the same effect as by a general limitation act would be to deprive a creditor of the unquestioned right, given him by the section of the statue itself, to recover a judgment after two years and satisfy his claim out of subsequently discovered assets not inventoried")), the statute itself was not the basis of its holding. Rather, the basis of its holding was its emphasis upon the survival of the *in rem* obligation against the land. See Waughop, 165 Ill. at 129 ( "it [is not] incumbent on the holder of a note secured by a mortgage *** to probate his note when the maker is dead"; a mortgage foreclosure claim is an *in rem* proceeding "independent of [any] remedy given [to the mortgagee] by filing his claim in the probate court"). Correspondingly, that statute was certainly not the basis of the similar holding by our supreme court in Markus. See Markus, 373 Ill. at 562 (statute at issue was section 94 of the Business Corporations Act (Ill. Rev. Stat. 1939, chp. 32, par. 157.94), which "limit[s] suits against the corporation, its officers or stockholders, to a period of two years after dissolution").

30

As such, we reject defendant's contentions and continue to adhere to the supreme court decisions in Markus and Waughop. Consequently, under the foregoing principles set out by our supreme court, we find that in the present case the two-year limitations period set forth in section 18-12 of the Probate Act incorporated through section 13-209 of the Code of Civil Procedure did not in any way preclude or time bar plaintiff's independent *in rem* mortgage foreclosure claim and that the trial court was not thereby deprived of subject matter jurisdiction.

―――――

Defendant nevertheless cites to Volkmar v. State Farm Mutual Automobile Insurance Co., 104 Ill. App. 3d 149, 151 (1982), for the proposition that because "a dead person is a nonexistent entity and cannot be party to a suit," proceedings instituted against such a person are "void *ab initio* and do not invoke the [subject matter] jurisdiction of the trial court." We find that case inapposite. In Volkmar, plaintiff, injured in an automobile collision, brought suit against the insurer of the operator of the vehicle that struck her, claiming that the insurer was an assignee of the amount of personal injury judgment entered against the operator of the vehicle in excess of policy limits. Volkmar, 104 Ill. App. 3d at 150. In that case, the court held that the right against the insurer was wholly derivative of the right to proceed against the tortfeasor in that the tort victim in no way held an independent security interest against the insurer. Volkmar, 104 Ill. App. 3d at 151.

Unlike in Volkmar, as already discussed above, here plaintiff filed a mortgage foreclosure action, an *in rem* proceeding directly against the property itself, so as to ascertain

31

his rights in that property as against the world. In addition, here the trial court specifically ruled that, based on the reverse mortgage agreement, there could be no deficiency judgment (a personal judgment) entered against Raymond if the foreclosure sale was insufficient to satisfy the secured debt. As such, the action was solely against the property.

Defendant nevertheless contends that *in rem* refers to an alternative to personal jurisdiction, and not to subject matter jurisdiction, and that therefore the *in rem* status of the mortgage foreclosure proceeding does not create subject matter jurisdiction over a claim that is filed against a deceased mortgagor.

We first note that defendant is correct in asserting that a circuit court's jurisdiction is of two distinct types: subject matter jurisdiction and personal jurisdiction. See Keller v. Walker, 319 Ill. App. 3d 67, 70 (2001). While personal jurisdiction refers to the power of the circuit court to bind the parties to its judgments (see Black's Law Dictionary 1030 (5th ed. 1979); see also First National Bank of Chicago v. Boelcskevy, 126 Ill. App. 3d 271, 276 (1984)), subject matter jurisdiction serves to restrict judicial authority over the type of claims that the circuit court may adjudicate (see In re A.H., 195 Ill. 2d 408, 415 (2001)).

We find, however, that defendant's characterization of an *in rem* proceeding is incompatible with what our supreme court said in Waughop, namely that an *in rem* action to foreclose a mortgage remains alive even when a party dies because it remains alive as against the land. See Waughop, 165 Ill. at 128. That principle enunciated by our supreme court is consistent with Black's Law Dictionary definition of an *in rem* action, according to which:

"An 'action *in rem*' is a proceeding that takes no cognizance of [an] owner but

32

determines right in specific property against all of the world, equally binding on everyone. [Citation.] It is true that, in a strict sense, a proceeding *in rem* is one taken directly against property, and has for its object the disposition of property, without reference to the title of individual claimants \*\*\*. \*\*\* In the strict sense of the term, '*in rem*' is one which is taken directly against property or one which is brought to enforce a right in the thing itself." Black's Law Dictionary 713 (5th ed. 1979).

As such, the very nature of an *in rem* proceeding, being that of a suit against the *res*, suggests that the common-law principle of denying subject matter jurisdiction in a suit filed against a deceased person would not apply to an *in rem* action, in which the right to the property is determined not simply against an entity, but rather as against the entire world. See In re Commissioner of Banks & Real Estate, 327 Ill. App. 3d 441, 465 (2001), quoting Black's Law Dictionary 713 (5th ed. 1979) ("An 'in rem action' is a proceeding that takes no cognizance of owner but determines right in specific property against all of the world, equally binding"); see also Waughop, 165 Ill. at 129-30 (1896); Clifford v. Levin, 282 Ill. App. 263, 267 (1935) (held that a suit for foreclosure is "essentially and fundamentally a proceeding *in rem* against [real] property"); McKerchar v. Ayres, 300 Ill. App. 518, 521 (1939) (held that a foreclosure is a proceeding "brought to enforce a right against the property itself")

We further note that if we have any concern at all it is not that there is a right against the land, as Waughop clearly says that there is, but rather, that there is no single person claiming ownership of the land since the land was never probated. However, this claim is not uncontested in that the decedent's son has vigorously defended against the foreclosure action.

33

Moreover, no one here has contended that plaintiff failed to provide adequate notice to all those who may have had an interest present or potential in the property. As such, defendant cannot well contend while vigorously contesting this action, that there is no opposing party.

Defendant finally asserts, in the alternative, that because plaintiff's complaint named Mabel as the sole mortgagor and obligor on the underlying promissory note, under section 15-1501 of the Illinois Mortgage Foreclosure Law she was a "necessary party" to the foreclosure proceedings (see 735 ILCS 5/15-1501(a) (West 2002)) without whom the trial court should not have proceeded to judgment.[21] In support of this contention, defendant cites to no supporting authority or case law but, rather, simply contends that section 15-1107[22] of the

_____

[21]Section 15-1501 states: "For the purposes of the Code of Civil Procedure, only (i) the mortgagor and (ii) other persons (but not guarantors) who owe payment of indebtedness or the performance of the other obligations secured by the mortgage and against whom personal liability is asserted shall be necessary parties defendant in a foreclosure." 735 ILCS 5/15-1501(a) (West 2002).

[22]Section 15-1107 of the Illinois Mortgage Foreclosure Law states that, "[e]xcept as otherwise provided ***, the mode of procedure, including the manner of service of pleadings and other papers and service by publication, shall be in accordance with the [civil provision] of the Illinois Code of Civil Procedure and any other statutes of [Illinois] which are from time to time applicable." 735 ILCS 5/15-1107(a) (West 2002). Section 15-1107 further states that, "in case of such inconsistency, [any otherwise incorporated provision] shall not be applicable to actions

Mortgage Foreclosure Law incorporates section 13-209(b) of the Code of Civil Procedure, which sets out the procedure for filing an action after a party has died, and requires the naming of a personal representative of the deceased party within six months after the person's death.

A point raised but not argued or supported by citation to relevant authority fails to satisfy the requirements of Supreme Court Rule 341(e)(6). 188 Ill. 2d R. 341(e)(6). Because defendant has failed to elaborate on his argument or cite to any relevant case law in support thereof, we hold that he has waived this issue for purposes of appeal. See People v. Ramirez, 98 Ill. 2d 439, 472 (1983).

2. Motion for Summary Judgment

Defendant next contends that in addition to the two arguments already raised and resolved above with respect to defendant's section 2-619 motion to dismiss the complaint, the trial court erred when it granted plaintiff's motion for summary judgment because there is a genuine issue of material fact as to whether the mortgage was produced by fraud. For the reasons that follow, we disagree.

"The purpose of summary judgment is not to try a question of fact, but rather to determine whether a genuine issue of material fact exists," and if one does not, exist to determine if the moving party is entitled to judgment as a matter of law. Adams v. Northern Illinois Gas Co., 211 Ill. 2d 32, 42-43 (2004). "Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions,

---

under this Article." 735 ILCS 5/15-1107(a) (West 2002).

admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." General Casualty Insurance Co. v. Lacey, 199 Ill. 2d 281, 284 (2002); 735 ILCS 5/2-1005©) (West 2004). When we review a circuit court's order granting summary judgment, our standard of review is *de novo*. Home Insurance Co. v. Cincinnati Insurance Co., 213 Ill. 2d 307, 315 (2004).

Where, like here, the plaintiff is the movant, the burden is on him to establish by affirmative evidence all essential elements of the cause of action not admitted in the pleadings and to negate any affirmative defenses raised by the defendant. See Motz v. Central Nat. Bank, 119 Ill. App. 3d 601 (1983). If the movant carries the burden of proof, the burden of production shifts to respondent to produce factual evidence that contradicts the movant's evidence. See Carruthers v. B.C. Christopher & Co., 57 Ill. 2d 376, 380 (1974) ("If the party moving for summary judgment supplies facts which, if not contradicted, would entitle such a party to a judgment as a matter of law, the opposing party cannot rely on his complaint or answer alone to raise genuine issues of material fact"); see also Harris Bank Hinsdale, N.A. v. Caliendo, 235 Ill. App. 3d 1013, 1024 (1992) (to withstand a motion for summary judgment, the nonmovant "must present some factual basis that arguably may entitle him to judgment"); Sacramento Crushing Corp. v. Correct/All Sewer, Inc., 318 Ill. App. 3d 571, 575 (2000) ("The [mere] suggestion that an issue of material fact exists, without supporting evidence, is insufficient to create one").

In the present case, our review of the pleadings, depositions and affidavits on record, construed in the light most favorable to the defendant, leads us to conclude that plaintiff

presented a sufficient factual basis to establish his cause of action and to negate any possibility of the existence of a genuine issue of material fact as to fraud.

To state a *prima facie* case sufficient to entitle a party to a decree of foreclosure, a plaintiff must introduce into evidence the mortgage and note, "duly executed and acknowledged before a notary public and recorded in the office of the recorder of deeds" and identified by the mortgagee. Staltzer v. Blue, 312 Ill. App. 563, 569 (1942) (court held that the introduction into evidence of the trust deed and notes, which were "in the usual form of documents of that character" and were "duly acknowledged before a notary public and recorded in the office of the recorder of deeds" and were "duly executed and acknowledged, [and] identified by the trustee named in the trust deed, *** made a *prima facie* case as to consideration, execution and delivery of same"); see also Boudinot v. Winter, 91 Ill. App. 106, 108-09 (1900) (held that " [w]hen appellee introduced in evidence the notes and mortgage, as he did, *** a *prima facie* case for the foreclosure thereof was made against appellant, and the burden of proof was upon him to show *** some other affirmative matter of defense, having the effect to discharge the obligation of the note and mortgage").

In the present case, we find that Raymond's deposition testimony regarding his execution of the mortgage agreement on his mother's behalf, the copy of the power of attorney, and the copy of the mortgage agreement with evidence of its recording, as well as plaintiff's verified amended complaint, are sufficient *prima facie* evidence of secured indebtedness owed plaintiff and entitlement to enforce the security.

37

Defendant nevertheless contends, for the first time on appeal, that plaintiff did not satisfactorily establish all of the elements that would entitle it to entry of a judgment of foreclosure because it did not establish the validity of the signatures on the mortgage itself, impliedly suggesting that the notary might not have notarized the mortgage on the day it was apparently executed. In support of this allegation of an invalidly executed mortgage, defendant, in his brief, refers to his deposition testimony indicating his surprise that the original check given to Mabel was for the amount of $55,000 and asserts that it was likely that when plaintiff tendered the originally reverse mortgage payment check to Mabel to give to SCR, someone turned the check over so that Mabel and her son did not see that the check was for the amount of $55,000, but were left believing that the check was in the amount of $15,000.

We do not address the merits of defendant's contention because we find that he has waived this issue for purposes of appeal both by not pleading it as an affirmative defense in his answer to plaintiff's amended complaint (see Currey v. Blackwell, 295 Ill. App. 613 (1938) (abstract of op.) ("[u]nder the Civil Practice Act, in suit to foreclose trust deed, defense of alteration of trust deed, which was not pleaded, could not be relied on by defendants, who sought to make such defense for the first time before the master"), and by not raising it in his response to plaintiff's motion for summary judgment (see Ragan v. Columbia Mutual Insurance Co., 183 Ill. 2d 342, 355 (1998) ("[q]uestions not raised in the trial court cannot be argued for the first time on appeal" as it would be unfair not to allow the parties to first address them in the trial court, particularly where the issue would have been curable if raised below)).

Defendant next contends that there remains a genuine issue of material fact as to whether the underlying note and mortgage were procured by fraud. Defendant specifically asserts that SCR, a home improvement contractor, defrauded Mabel and that its fraudulent representations caused her to enter into the reverse mortgage with plaintiff's predecessor, essentially making SCR the agent of plaintiff's predecessor in interest, or the predecessor in interest the agent of SCR. Plaintiff responds that the affidavit of Sylvia Gotelli attached to its motion for summary judgment and indicating that plaintiff's predecessor in interest never had a relationship with SCR precludes any genuine issue of material fact with respect to defendant's affirmative defense of fraud. We agree.

In support of its motion for summary judgment, defendant submitted the affidavit of Sylvia Gotelli in which Gotelli stated that, as an employee of plaintiff since 2002, she has had principal responsibility for the Kirgis loan and is familiar with the file and its contents. Gotelli indicated that the files on record include all communications from the inception of the loan through the date on which plaintiff acquired the assets from its predecessor (in November 2000) to the present. According to Gotelli, the existing files contain no communication written or oral from the borrower before Mabel's death regarding alleged fraud, misstatements of fact and/or alleged deception, or at the time of the borrower's second draw on this loan in the sum of $14,000. In addition, in her affidavit Gotelli attested that plaintiff has and had no business, financial, agency or other relationship with SCR.

Defendant asserts that Gotelli's affidavit was inadmissible evidence because she was "not competent to testify" concerning any matters before her employ by plaintiff commenced in

2002 and therefore had no personal knowledge of the facts as they occurred on May 9, 1997, when the reverse mortgage was entered into by plaintiff's predecessor and Mabel. We disagree.

We first note that defendant has waived this issue for purposes of appeal because he failed to challenge the admissibility of Gotelli's affidavit in the trial proceedings. Under Supreme Court Rule 191(a):

> "Affidavits in support of and in opposition to a motion for summary judgment under section 2-1005 of the Code of Civil Procedure *** shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all papers upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto. If all of the facts to be shown are not within the personal knowledge of one person, two or more affidavits shall be used."

> 134 Ill. R. 2d 191(a).

A party who has Rule 191 objections to an affidavit must attack the target by motion to strike "at the time of the action complained of, or at the first opportunity thereafter," and may not attack the sufficiency of an affidavit for the first time on appeal. Stone v. McCarthy, 206 Ill. App. 3d 893, 899 (1990) (held that nonmovant appealing the entry of summary judgment

who had filed no Rule 191 challenge to the affidavit to which he objected on appeal, had not objected to its conclusoriness at the hearing on the motion, had not filed a counteraffidavit at that time, and had not objected "in any fashion to the affidavit's sufficiency until his motion to reconsider *** well after the entry of judgment" waived his objection to the affidavit's sufficiency); see also <u>Arnett v. Snyder</u>, 331 Ill. App. 3d 518, 523 (2001) ("In Illinois *** the sufficiency of affidavits cannot be tested for the first time on appeal where no objection was made by a motion to strike, or otherwise, in the trial court"); <u>Abel v. General Motors Corp.</u>, 155 Ill. App. 3d 208, 221 (1987) ("the sufficiency of an affidavit cannot be tested for the first time on appeal where no objection was made in the trial court").

Waiver aside, inasmuch as plaintiff's affidavit was not contradicted or refuted by admissible evidence offered by defendant, the allegations in the affidavit must be taken as true. Once the movant presents admissible evidence through affidavit it is incumbent on respondent to refute those evidentiary facts, and if he fails to do so, the facts are admitted. See <u>Raintree Homes, Inc. v. Village of Long Grove</u>, 209 Ill. 2d 248, 262 (2004) ("[w]hen supporting affidavits have not been challenged or contradicted by counteraffidavits or other appropriate means, the facts stated therein are deemed admitted"); see also <u>Sacramento Crushing</u>, 318 Ill. App. 3d at 575 ("[f]ailure to file counteraffidavits in opposition to a summary judgment motion supported by affidavits is fatal").

Defendant asserts that Gotelli's affidavit is refuted by Raymond's deposition testimony

and two documents evidencing fraud: (1) a copy of SCR's advertising flyer[23] and (2) a copy of a letter by the office of the State's Attorney addressed to Mabel indicating that the State had filed suit against SCR and "had successfully shut down SCR and had sought as much restitution as possible to be returned to the victims of SCR's illegal business dealings."[24] We disagree.

We first find that defendant's reliance on the two documents as factual evidence of fraud is misplaced as neither would have been admissible piece at trial. In determining the genuineness of fact on summary judgment, "a court should consider only facts admissible in evidence" (Gardner v. Navistar International Transportation Corp., 213 Ill. App. 3d 242, 247 (1991)), and any evidence that would "be [in]admissible at trial cannot be considered in a summary judgment proceeding" (People ex rel. Vuagniaux v. City of Edwardsville, 284 Ill. App. 3d 407, 412 (1996)). Basic rules of evidence require that a party must lay the proper foundation for the introduction of a document into evidence. Gardner, 213 Ill. App. 3d at 247.

---

[23]This flyer reads in pertinent part:

"[SCR] *** is proud to announce a new federally insured and regulated program for senior citizens. We can remodel your home and provide extra money for the holidays with absolutely no monthly payments for as long as you live. We provide services for new windows, bathrooms ***. There are no credit requirements, income requirements or monthly payments and best of all its federally insured and regulated."

[24]This letter enclosed a check for $109.55 as nominal restitution to be paid to Mabel.

42

To properly authenticate a document, a party must present evidence which demonstrates that the document is what the party claims it to be. Gardner, 213 Ill. App. 3d at 247-48. A document the authenticity of which is not established is not admissible in evidence. Gardner, 213 Ill. App. 3d at 248; see also Harris Bank, 235 Ill. App. 3d at 1025-26 (holding that an "unsworn and uncertified" copy of a letter allegedly sent by a mortgagee's vice president was properly disregarded by the trial court in deciding a motion for summary judgment because it was not shown that the vice president had personal knowledge of the information contained therein).

In the present case, the two documents that defendant relies on were not identified by Kirgis at his deposition, and in opposition to plaintiff's motion, neither was offered with any affidavit support. As such, these items were not authenticated and constitute inadmissible hearsay. Therefore, they do not constitute evidence of the nature of representations made by SCR to Mabel or evidence that SCR sold Mabel a reverse mortgage, or that the Office of the State's Attorney prosecuted SCR for fraudulent representations or that it considered the home improvement contract tainted by fraud or illegality.

Nevertheless, even assuming that both of the documents introduced by defendant would have been admissible, neither would be sufficient to raise a reasonable inference that would support a conclusion that there was any collusion between SCR and the plaintiff. First, neither document shows what type of fraud was perpetrated by SCR, let alone what type of fraud, if any, could have been perpetrated by plaintiff acting in collusion with SCR. The letter by the office of the State's Attorney does not provide any specifics as to the type of fraud

alleged against SCR, and states only that the State's Attorney has "filed suit" against SCR and "successfully shut [it] down," and that it is in the process of seeking "as much restitution as possible" to be returned to the victims of the company's "illegal business dealings." More importantly, that letter makes no mention of plaintiff, or reverse mortgages in general. Similarly, although the SCR advertisement makes reference to reverse mortgages, it fails to show any business association between SCR and plaintiff, as neither plaintiff nor plaintiff's predecessor are mentioned anywhere on that pamphlet.

We further find that defendant's reliance on Raymond's deposition to counter Gotelli's affidavit is misplaced because that deposition contains no evidence directly refuting Gotelli's affidavit. Although depositions may be used in lieu of a counteraffidavit to oppose summary judgment motions (4 R. Michael Illinois Practice §39.7 at 258-59 (1989)), when used in such a manner, they must meet the affidavit requirements of Rule 191(a) (134 Ill. 2d R. 191(a)), including the requirement that it be made on the personal knowledge of the deponent and that it not consist of conclusions but of facts admissible in evidence (Stando v. Grossinger Motor Sales, Inc., 89 Ill. App. 3d 898, 901(1980 ); see also, Roe v. Jewish Children's Bureau of Chicago, 339 Ill. App. 3d 119, 127 (2003) (affidavits offered in support of or in opposition to a motion for summary judgment that merely set forth legal conclusions or opinions without stating supporting facts are insufficient and must be stricken)).

In the present case, in his deposition Raymond stated that after Mabel was solicited by telephone by a remodeling company called SCR to remodel her home, and representatives of SCR came to estimate the costs, SCR "looked to" plaintiff's predecessor to finance the

remodeling. However, Raymond's deposition fails to provide any facts or admissible evidence to support these conclusory statements. In fact, when specifically asked if "the representative, the estimator *** from [SCR] [had] said that he had some connection with [plaintiff's predecessor] to handle financing for repairs," Raymond answered, "I don't know," but added that it appeared that SCR "went to" or "looked to" the mortgage company to finance its repairs. In addition, at his deposition, Raymond testified that after SCR completed the estimate (or "contract"), three individuals came to the house to speak to Mabel about the reverse mortgage: Beem, from the reverse mortgage company; Cannellis, an independent appraiser; and a third individual, allegedly from SCR. Raymond then identified two business cards, which he had kept from these individuals, but neither showed an SCR representative.[25]

We find that this conclusory testimony, when contrasted with the Gotelli affidavit, was insufficient to establish collusion, other than the fact that there may have been an agreement between plaintiff's predecessor and the contractor to finance its customers. While this may indicate a potential possibility of a collusive relationship, it is insufficient to allow for an inference that an actual collusive relationship existed. As such, Kirgis failed to aver, much less establish with competent admissible facts, that the same individuals sold the home repair service and the reverse mortgage.

Defendant lastly contends that the trial court erred in granting the motion for summary

---

[25]The two business cards were from Beem, a representative of plaintiff's predecessor, and Cannellis, an independent appraiser.

judgment because it did not permit him more discovery on his counterclaim for breach of the settlement agreement. Although in his response to plaintiff's motion for summary judgment defendant initially contended that there was a genuine issue of material fact as to whether the parties had actually entered into a settlement agreement, on appeal, defendant's sole assertion with respect to the settlement question is that the trial court did not leave him sufficient time for discovery.

Our review of the record with respect to discovery reveals that defendant never asked for more discovery on the settlement issue, and that no such request was denied. Moreover, defendant makes no assertion on appeal that he ever requested more time for discovery. As such, we find that defendant cannot proceed with this contention before us.

For the foregoing reasons, we affirm the judgment of the circuit court.


Affirmed.

FITZGERALD SMITH, P.J., and McNULTY, J., concur.